[No. B016601. Second Dist., Div. Four. Mar. 22, 1989.]

KAREN IRENE MARTINIDES, Plaintiff and Appellant, v. JODA MAYER, Defendant and Appellant.

## COUNSEL

Knapp, Petersen & Clarke, Horvitz, Levy & Amerian, Barry R. Levy, S. Thomas Todd and Kathy Eldredge for Defendant and Appellant.

Hurley, Grassini & Wrinkle and Roland Wrinkle for Plaintiff and Appellant.

## OPINION

**GOERTZEN, J.**—After a jury trial, defendant/appellant Joda Mayer (defendant) was found liable for personal injuries suffered by plaintiff/appellant Karen Irene Martinides (plaintiff) when she was hit by a car.[1] Defendant appeals, asserting the court erroneously allowed the jury to apply the doctrine of res ipsa loquitur. Plaintiff appeals, contending the court erred when it conditionally granted defendant's motion for a new trial unless plaintiff agreed to a reduction of the jury award from $3,868,332.75 to $2.5 million.

### FACTS[2]

On August 5, 1979, around 9 p.m., plaintiff was visiting her mother-in-law when she went out to her car to get a blanket for her baby. Traffic was clear as she approached her parked car. As she arrived at the driver's side door, she observed a car coming directly at her at an exceedingly high rate of speed. She "squished" as close as she could to her car, putting her hands over the top of it. The speeding vehicle crashed into her, carried her, then struck another parked car and finally deposited her under a third vehicle. Plaintiff recalled seeing two people in the car that hit her but remembers nothing else concerning the accident. After hitting the plaintiff, the driver of the speeding car fled.

Officer Anthony Bartolotto, an 18-year veteran of the Los Angeles Police Department, was in charge of the investigation. He has investigated between five and ten thousand automobile accidents, the majority of which involved hit-and-run incidents. Officer Bartolotto recovered some blue paint chips and a broken-off "500" emblem at the location of the car which was

---

[1] The other defendant, Robert Neil Rosenberg, is not a party to this appeal.

[2] Consistent with long-established rules on appeal, these facts are related in the light most favorable to the judgment. (*Walling* v. *Kimball* (1941) 17 Cal.2d 364, 373 [110 P.2d 58].)

parked in front of plaintiff's vehicle. He took them to a Ford dealership and learned that the hit-and-run vehicle was a Ford Galaxie "500" painted "copra blue."

After an intensive search, the vehicle was located at the residence of defendant and codefendant Rosenberg (Rosenberg), one block from the accident scene.[3] Utilizing the broken "500" emblem, the blue paint chips, and a piece of human hair, as well as some molding and paint transfers from the car parked in front of plaintiff's vehicle, the Ford Galaxie was identified as the hit-and-run vehicle. After some initial interrogation, during which Rosenberg admitted he was the owner of the Ford, the vehicle was impounded and Rosenberg was brought to the police station for further questioning. He denied responsibility for, or knowledge of, the accident and was unable to explain the damage to his car. In her deposition, defendant testified she did not remember the night the investigating police officer located the hit-and-run vehicle at her residence and questioned her about it. She stated she did not remember because she had drunk "a lot" of Scotch and was "intoxicated." At trial, however, defendant testified that she had consumed three drinks and participated in a three-way conversation with Rosenberg and the police.

At the time of the accident, defendant owned an MG automobile. She had accompanied Rosenberg when he purchased the Ford so Rosenberg could drive the MG to work in Oxnard. Each of them had one of the two sets of keys. Defendant was the primary driver of the Ford; the only time Rosenberg drove it was when they were going someplace with the children or if the MG were unavailable for him to drive to work. No one other than defendant or Rosenberg drove the Ford. There was no evidence that the Ford had been tampered with or stolen.

Defendant denied any involvement in or having any knowledge of the accident in which plaintiff was injured. She further could not recall her whereabouts on the date of the accident.

During her deposition, defendant attempted to explain the damage to the Ford by attributing it to a prior accident. She explained that in June 1979, she was driving the Ford on the Ventura Freeway and was involved in an accident. Rosenberg was the passenger. She specifically recalled driving at the time of the June accident.[4] At trial, defendant told a different story. She

---

[3] At the time of the accident, defendant was unmarried but living with the codefendant Rosenberg. At the time of her deposition, defendant was married to Rosenberg; however, at the time of trial, she and Rosenberg were legally divorced.

[4] Actually, at trial counsel identified the previous accident as having occurred in *July* 1979. It is apparent, however, that the testimony concerned the same accident about which defendant testified in her deposition.

testified that she lied during her deposition when questioned about the June accident. At trial, defendant testified that she was not driving at the time of the June accident. She had intentionally lied during her deposition and when she filed a form with the Department of Motor Vehicles, under penalty of perjury, swearing that she was the driver in the June accident. In her deposition, defendant testified she had driven home after the June accident. At trial, she testified that this was another lie under oath.

There were several eye witnesses to the August 1979 accident. Officer Bartolotto interviewed all of the witnesses he could find. The witnesses varied in their description of the driver. Someone referred to the driver as a female or, at least, as having longer hair. None could identify the driver of the vehicle involved in the accident as either defendant or Rosenberg. This inability to make a positive identification of the driver did not surprise Officer Bartolotto because the accident occurred at night when the inside of a darkened vehicle cannot be seen; the one globe street light was 125 feet from the accident site; and, at best, the witnesses would have had a profile view of the driver.

Kathy Vance testified that she, her husband and daughter were driving northbound when they noticed a large, fast-moving blue car pull out of a driveway and onto the street. Ms. Vance saw only one person in the car, the driver, whom she described as being "a male Latin, very, very short dark hair." As the Vance's car turned the corner, they heard a crashing sound and a scream. The Vances made a U-turn and drove to the accident scene. By that time, the blue car had driven off.

David Vance, Ms. Vance's husband at the time of the accident, also observed only one occupant in the Ford. The driver's square shoulders convinced Mr. Vance that the driver was a man.

Armando Ruiz was cleaning a hotel pool near the accident scene. He testified that he heard the collision, looked up, and saw the suspect vehicle. It appeared to contain only one occupant. At the time of trial, he described the driver as having "short hair"; however, he was unsure whether the occupant was male or female. He admitted that when questioned by the police at the time of the accident, he had indicated that the driver was male.

At the time of the accident, plaintiff was 22 years old and her baby was 4 months old. Plaintiff had several preexisting conditions. She was born with two clubfeet. She had had eight or nine corrective surgeries to the left foot and two surgeries to the right, all of which occurred the first eleven years of her life, most before she was seven. One surgery fused her left ankle and resulted in very limited movement of plaintiff's left ankle and foot. After

these surgeries, there were no restrictions placed on her activities. After birth, plaintiff also developed facially related problems whereby a dead nerve limited movement in both her cheeks; she was unable to smile.

Plaintiff ended her formal education with high school, where she was a C-student. After high school, she participated in but did not finish a claims adjuster training course with Blue Cross; she also trained to be a typing receptionist for another company or hospital. At the time of the accident, plaintiff was not employed because of recently having given birth. Before she became pregnant, plaintiff had worked as a nurse's aide for nine to eleven months at a convalescent hospital and for several months in a home for the aged. Prior to working as a nurse's aide, plaintiff had worked as a typing receptionist at the VA Hospital and as a nanny with children. Just before becoming pregnant and again in July 1979, plaintiff had discussed with her parents her desire to study to be a Licensed Vocational Nurse (LVN) and asked for their financial assistance. At the time of the accident, on August 5, 1979, she had not had an opportunity to apply for entrance to a LVN program.

As a result of the accident, plaintiff suffered many injuries. Upon arrival at the hospital, she was not expected to live. She had no blood pressure and was in a deep coma, with cerebrospinal fluid leaking from her ear as the result of a skull fracture. Her lungs collapsed and there was blood in her urine. According to her treating physician, she was "massively injured." All four extremities and her pelvis were fractured. As the doctors felt that she was only going to live for two or three days, it was just a matter of waiting. As she was so critically ill, the doctors were unable to perform the required orthopedic surgeries. Instead, they operated on her in the emergency room without anesthesia.

Eventually, plaintiff's blood pressure returned, but she remained coma-tose. After being moved to intensive care, there were tubes coming out of her nose, her mouth, her left side and chest. Her legs, with steel rods through them, were held up by traction cords. A tracheotomy was performed so that she could be hooked up to a resuscitator.

Plaintiff remained in a deep coma for several weeks. The swelling of the brain was inoperable. She suffered seizures while still in the coma and was given Dilantin to control them. Eventually the traction was replaced by braces. On September 12, 1979, a metal plate and screws were placed in the left forearm. About five weeks after the accident, plaintiff came out of the coma. She remained in intensive care for approximately six to seven weeks.

Plaintiff stayed in the hospital four and one-half months. While her normal body weight was about 110 pounds, she now weighed in the low

60's. She moved into her mother's house, still unable to walk. She continued to be cared for at her mother's home, undergoing speech, personal and physical therapy for the following three years. She wore braces and walked with a walker for a year and a half. After the braces were removed, she walked on the carpet on her knees and returned to the wheelchair when her kneecaps swelled. From her knees, she went to a walker with wheels.

In October 1982, plaintiff moved to an apartment with roommates. At the time of trial, she was attempting to learn to live independently with the assistance of the Independent Living Center in Van Nuys.

As of April of 1985, plaintiff has used an electric wheelchair. She needs constant care. Her speech is difficult to understand, and speech therapy cannot improve the problem. She has difficulty speaking, has a short attention span, very slow reflexes and memory problems. She tried to take a course in sign language so that she could communicate but was unable to complete it.

Plaintiff's mother has legal custody of plaintiff's child.

### PROCEDURAL HISTORY

At trial, the issues of liability and damages were bifurcated. Plaintiff's sole theory of liability was negligent operation of the Ford; she withdrew the issues of ownership and negligent entrustment. Over defendant's objection, the jury was instructed on the doctrine of res ipsa loquitur as to both defendants. At defendant's insistence, the jury was asked to answer seven questions as directed on a special verdict form.[5]

The jury returned its verdict in favor of plaintiff and against both defendants. When polled, the jury held unanimously that Rosenberg negligently operated the vehicle, and the jury held, 10 to 2, that defendant negligently operated the vehicle. Defendant objected to the verdict as inconsistent. The court requested briefing and continued the matter.

---

[5] The Special Verdict, in pertinent part, read and was answered as follows: "*Question No. 1*: Was the 1969 Ford vehicle the vehicle involved in the accident of August 5, 1979, with the plaintiff? . . . Answer Yes. . . . *Question No. 2*: Did defendant Joda Mayer operate the 1969 Ford vehicle at the time of the accident of August 5, 1979, with the plaintiff? . . . Answer Yes. . . . *Question No. 3*: Did defendant Joda Mayer negligently operate the 1969 Ford vehicle at the time of the accident of August 5, 1979, with the plaintiff? . . . Answer Yes. . . . *Question No. 4*: Was the negligence a legal cause of the accident of August 5, 1979? . . . Answer Yes. . . . *Question No. 5*: Did defendant Robert Rosenberg operate the 1969 Ford vehicle in the accident of August 5, 1979 with the plaintiff? . . . Answer Yes. . . . *Question No. 6*: Did defendant Robert Rosenberg negligently operate the 1969 Ford vehicle in the accident of August 5, 1979 with the plaintiff? . . . Answer Yes. . . . *Question No. 7*: Was the negligence a legal cause of the accident of August 5, 1979? . . . Answer Yes."

Defendant moved to set aside and vacate the jury's verdict on the ground that it was physically and legally impossible under the facts presented for both Rosenberg and defendant simultaneously to operate the vehicle. The court denied the motion, finding that the motion should have been one for new trial and was not timely until all the issues in a bifurcated case had been determined; the court also found that the defendant had waived any purported defect in the special verdict.[6]

The issue of damages was separately tried before a different jury, which awarded plaintiff $3,868.332.75.

Defendant moved for judgment notwithstanding the verdict, or in the alternative, to vacate and set aside the judgment. Defendant also moved for a new trial based, among other grounds, on excessive damages. The court granted the new trial motion unless plaintiff consented to a reduction of damages to $2.5 million, which she did. The court's nine-page ruling on the motion for new trial, including its specification of reasons for finding excessive damages, is attached to this opinion as Appendix A.

## DEFENDANT'S APPEAL

Defendant's sole contention on appeal is that the court erroneously and prejudicially charged the jury with the conditional res ipsa loquitur instruction.[7] For the reasons stated below, we find this contention to be without merit.

---

[6] In making this ruling, the court commented: "Basically what the defendants were saying to the court is that it is physically and legally impossible for there to be a determination that both defendants—that is, Mayer and Rosenberg[,] operated the same vehicle at the time of the accident in August, 1979, and I agree with the defendants, as do the plaintiffs, that it is physically impossible for both to have been driving at the same time, but I also believe that under the factual circumstances of this case, plaintiffs were entitled to the conditional res ipsa loquitur instruction and defendants both had the opportunity to rebut the inference of negligence. [¶] Obviously by the special verdict, the jury found that they had not rebutted the inference of negligence and said that both were negligent in causing the accident. Both were driving, so I find that it is legally possible for both Mayer and Rosenberg to be legally responsible for the negligent operation of the vehicle under the inference of negligence created by a conditional res ipsa loquitur instruction. . . . [¶] For purposes of civil liability, both are deemed to be the negligent driver that legally caused the accident in question. [¶] If the defendants are objecting to the special verdict form, I find the objection is not well taken; [¶] That the defendants offered the special verdict form which was given to the jury and accordingly have waived any objection as to the form or content thereof. [¶] I believe the special verdict form was in proper form under the factual circumstances and the law applicable thereto in this case."

[7] The court charged the jury with BAJI No. 4.00, which provided: "On the issue of negligence, one of the questions for you to decide in this case is whether the accident involved occurred under the following conditions: [¶] First, that it is the kind of accident which ordinarily does not occur in the absence of someone's negligence; [¶] Second, that it was caused by an agency or instrumentality in the exclusive control of the defendants; and [¶] Third, that the

■ "It is settled law in this state that the 'doctrine of res ipsa loquitur is applicable where the accident is of such a nature that it can be said, in the light of past experience, that it probably was the result of negligence by someone and that the defendant is probably the one responsible. [Citations.]' [Citation.] According to the classic and oft-repeated statement, there are three conditions for the application of the doctrine: ' "(1) the accident must be of a kind which ordinarily does not occur in the absence of someone's negligence; (2) it must be caused by an agency or instrumentality within the exclusive control of the defendant; (3) it must not have been due to any voluntary action or contribution on the part of the plaintiff." ' [Citations.]" (*Newing* v. *Cheatham* (1975) 15 Cal.3d 351, 359 [124 Cal.Rptr. 193, 540 P.2d 33].)

■ In the instant case, defendant concedes that the first and third factors have been established. The gist of her appeal is that the doctrine's second element—exclusive control—has not been satisfied; consequently, the burden of overcoming the inference of negligence should not have been shifted to her. In support of this contention, defendant points to the impossibility of both she and Rosenberg driving the Ford simultaneously, as found by the jury; she also grounds this assertion on her belief that the doctrine of res ipsa loquitur can be applied against multiple defendants only if the relationship between the defendants warrants shared responsibility for the injury-causing event. This is not the rule in California; therefore, we reject defendant's contention.

■ We begin our discussion with an acknowledgement of the policy concerns which prompted the formulation of the res ipsa loquitur doctrine. "If [it] is to continue to serve a useful purpose, we should not forget that 'the particular force and justice of the rule, . . . , consists in the circumstance that the chief evidence of the true cause, whether culpable or innocent, is practically accessible to [the defendants] but inaccessible to the injured person.' [Citations.] . . . [W]ithout the doctrine the maxim that for every wrong there is a remedy would be rendered nugatory, 'by denying one, patently entitled to damages, satisfaction merely because he [or she] is ignorant of facts peculiarly within the knowledge of the party who should, in all justice, pay them.' " (*Ybarra* v. *Spangard* (1944) 25 Cal.2d 486, 490

---

accident was not due to any voluntary action or contribution on the part of the plaintiff which was the responsible cause of the accident. [¶] If, and only in the event that you should find all these conditions to exist, you are instructed as follows: [¶] From the happening of the accident involved in this case, you may draw an inference that a cause of the accident was some negligent conduct on the part of the defendants. [¶] However, you shall not find that a legal cause of the accident was some negligent conduct on the part of the defendants unless you believe, after weighing all the evidence in the case and drawing such inferences therefrom as you believe are warranted, that it is more probable than not that the accident was caused by some negligent conduct on the part of the defendants."

[154 P.2d 687, 162 A.L.R. 1258].) Clearly, the particular facts of the case before us places it within the reason and spirit of the doctrine.

■ "It is well settled that the exclusive control required by the doctrine of res ipsa loquitur is not the exclusive control of any one defendant. All that is necessary is that the plaintiff eliminate the probability that the accident was caused by someone other than the defendants. [Citation.] . . . [W]here all of the parties who exercised control over the instrumentality which caused the injury are sued together, the doctrine [of res ipsa loquitur] may be used, and the defendants called upon to explain how the injury came about. [Citations.]" (*Poulsen v. Charlton* (1964) 224 Cal.App.2d 262, 268 [36 Cal.Rptr. 347].) Moreover, when the control, *at one time or another,* of the agency which might have harmed the plaintiff was in the hands of every defendant, the initial burden of explanation is shifted to him or her. (*Ybarra v. Spangard, supra,* 25 Cal.2d at p. 492.) "[T]he test has become one of *right of control* rather than actual control." (*Id.,* at p. 493, italics added.)

■ Here, plaintiff sued both defendants together. The facts revealed at trial and summarized above provide the requisite substantial evidence to support the conclusion that defendants had the right of control over the Ford. They testified that they were the only ones who drove the Ford; defendant testified that she was the primary driver of the Ford; she also testified that there were only two sets of key and that she and Rosenberg each had one set. There was no evidence that the car had been stolen or even tampered with. Moreover, defendant concedes that the driver of the hit-and-run vehicle which struck the plaintiff was either herself or Rosenberg. Both were joined as defendants, and the case was tried against both. Defendant admits she committed perjury in this action regarding her involvement in a prior accident with the same vehicle. Apparently, this was done to create an inference that she was not the driver in the subject action. Both defendants denied they were the driver, and each asserts the other was not the driver.

Defendant Mayer objects, citing the physical impossibility of two persons simultaneously having driven the same Ford vehicle under the circumstances of this case, as found by the jury when it responded to the questions posed in the special verdict form. While such joint action in driving the vehicle was a physical impossibility in this case, we concur with the trial court and hold that under the legal principles evoked by the doctrine of res ipsa loquitur, both defendant Mayer and defendant Rosenberg can be legally responsible for the negligent operation of the Ford. In view of suit having been brought against both of the parties who had joint and exclusive right of control and access to the vehicle and the jury's implicit determination that defendant Rosenberg and defendant Mayer each failed to rebut the

inference that he or she negligently caused the accident, for purposes of civil liability each is deemed to be the negligent driver who legally caused the accident.

In addition, this objection fails because we find the issue of control in the instant case to be similar to that found in *Price* v. *McDonald* (1935) 7 Cal.App.2d 77 [45 P.2d 425]. In *Price,* a car, owned by McDonald and available for use by his daughter, coasted out of a driveway in the nighttime, crossed a public street, and crashed through the wall of a home where the plaintiff was sleeping. The daughter had brought the car home at 4 p.m. on the day of the accident and parked it on a level driveway. Six hours later the accident occurred. McDonald testified he had charge of the car in the nighttime. Neither McDonald nor his daughter, who were both defendants, would step forward and offer any explanation. The defendants argued that the res ipsa loquitur doctrine was applied improperly because two defendants were charged, and negligence can only be presumed where one person is in the exclusive control of the instrumentally. The *Price* court held that: "The control was in both of them and there is no basis upon which their responsibility could be divided. In such a case the doctrine of *res ipsa loquitur* applies to the conduct of both of the defendants or to neither of them. Had they been able to offer a satisfactory explanation as to the cause of the accident, either one or the other or both of them might have been absolved from liability, but the duty of explanation was upon them and not upon the plaintiff." (*Id.,* at p. 80.)

Finally, defendant argues that the *Ybarra* doctrine should be limited to cases involving special relationships. This limitation has not been imposed in California. (See *Raber* v. *Tumin* (1951) 36 Cal.2d 654 [226 P.2d 574]; 1 Witkin, Cal. Evidence (3d ed. 1986) Burden of Proof and Presumptions, § 263, pp. 220-221.)

### PLAINTIFF'S APPEAL

Plaintiff contends that the trial court's order granting a new trial on the ground of excessive damages is fatally defective because the court applied the incorrect standard when it reviewed the evidence. A further defect alleged is that the court's specification of reasons is insufficient as a matter of law because the court failed to discuss one aspect of plaintiff's injuries.

Code of Civil Procedure section 657 permits the granting of a new trial upon the ground of excessive damages if "after weighing the evidence the [trial] court is convinced from the entire record, including reasonable inferences therefrom, that the . . . jury clearly should have reached a different

verdict or decision."[8] ■ "The new trial motion is addressed to the sound discretion of the trial judge. In ruling on it, he [or she] is vested with authority to disbelieve witnesses and reweigh the evidence. On appeal, all presumptions are in favor of the order as against the verdict, and the appellate court will reverse only if a manifest and unmistakable abuse of discretion is shown. [Citations.]" (*Miller* v. *National American Life Ins. Co.* (1976) 54 Cal.App.3d 331, 345 [126 Cal.Rptr. 731]; *Schroeder* v. *Auto Driveaway Co.* (1974) 11 Cal.3d 908, 918-919 [114 Cal.Rptr. 622, 523 P.2d 662].) With these rules in mind, we turn to plaintiff's contention.

■ In support of this contention that the court applied an incorrect standard, plaintiff points to language in the court's specification of reasons where the court concludes that the jury "should have reached a different verdict." (Appen. A, pp. 2 and 9.) Plaintiff avers that the correct standard, as articulated in section 657, requires the trial court to find that the jury *clearly* should have reached a different verdict. A review of the record reveals no reason to believe the trial court applied an incorrect legal standard. We note that the trial judge has been on the bench for 10 years. Throughout his tenure, the statutory standard has remained the same. Plaintiff herself advised the trial court of the correct standard in her opposition to defendant's motion for a new trial. Given the presumption in favor of the court's order and the detailed analysis of the evidence presented by the court in its specification of reasons, we find that the court was aware of the correct standard of review and applied the same.[9]

■ Plaintiff further argues that the new trial order must be overturned because the court failed to discuss her severe brain damage. The trial court expressly recognized the seriousness of plaintiff's injuries as noted in its opening comment that, "There is no dispute that plaintiff sustained severe and disabling injuries, some of which are permanent in nature." (Appen. A, p. 2.) It upheld plaintiff's right to recover $2.5 million in compensatory damages. Moreover, section 657, quoted *supra* in footnote 8, requires only that the trial court specify the reasons why it finds the jury's verdict to be excessive. It does not require that the court state the reasons why it considers any portion of the jury's award to be supported by the evidence.

---

[8] Section 657 also provides: "On appeal from an order granting a new trial the order shall be affirmed if it should have been granted upon any ground stated in the motion, . . . except that (a) the order shall not be affirmed . . . upon the ground of excessive . . . damages, unless such ground is stated in the order granting the motion and (b) on appeal from an order granting a new trial upon the ground . . . of excessive . . . damages, it shall be conclusively presumed that said order as to such ground was made only for the reasons specified in said order or said specification of reasons, and such order shall be reversed as to such ground only if there is no substantial basis in the record for any of such reasons."

All statutory references are to the Code of Civil Procedure unless otherwise indicated.

[9] We reject out of hand plaintiff's attempt to defeat the court's order through application of an unrelated conclusive presumption to the standard of review.

We need not burden this opinion with a line by line analysis of the court's specification of reasons. We conclude that the evidence presented at trial and summarized above provides the requisite "substantial basis" for the very specific reasons carefully articulated by the court when it conditionally granted defendant's motion for new trial.

### DISPOSITION

The entire judgment is affirmed. Each party to bear her own costs.

Woods (A. M.), P. J., and George, J., concurred.

The petition of appellant Mayer for review by the Supreme Court was denied June 28, 1989.

APPENDIX A

FILED

FRANK S. ZOLIN County Clerk

AUG 2 1 1985

*R L Burnett*

BY R. L. BURNETT, DEPUTY

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

KAREN IRENE MARTINIDES, ) CASE NO. C 330876V
 )
 Plaintiff, ) RULING ON MOTION FOR NEW
 ) TRIAL AND OTHER MOTIONS
vs )
 )
ROBERT HILL ROSENBERG, et al.,)
 )
 Defendants. )
_____)

Various motions of defendant Joda Mayer came on regularly for hearing on August 21, 1985, and were decided as follows:

1. Motion for an order to enter judgment notwithstanding the verdicts, is denied.

2. Motion to vacate and set aside the verdicts rendered on May 23, 1985, and June 25, 1985, is denied.

3. Motion to vacate the decision of the Court in favor of plaintiff and against defendant Mayer on the issue of the Statute of Limitations and to enter a different decision and judgment in favor of defendant Mayer, is denied.

/ / /

/ / /

-1-

945

76T576T- PS 7-84

4. Motiom for new trial based on C.C.P. 657(5), excessive damages, is granted, and the verdict rendered by the jury on June 25, 1985, and judgment entered herein on June 25, 1985, is vacated and set aside. However, defendant's motion for new trial based on excessive damages is subject to the condition that said motion is denied if the plaintiff consents to a reduction of damages in the sum of $1,368,332.75, which said reduction reduces the verdict from $3,868,332.75, to $2,500,000.00. Plaintiff is hereby given to 4:00 p.m. on Friday, August 23, 1985, to file her consent to said reduction (remittitur).

THE SPECIFICATION OF THE REASONS FOR THE GRANTING OF SAID MOTION ON THE GROUNDS OF EXCESSIVE DAMAGES ARE AS FOLLOWS:

(1) The physical, mental and emotional injuries sustained by plaintiff do not justify the verdict. There is no dispute that plaintiff sustained severe and disabling injuries, some of which are permanent in nature; but the Court has concluded that the jury should have reached a different verdict.

Plaintiff was hospitalized from the day of the accident (August 5, 1979) until late December of 1979. She underwent surgery on the day of the accident for the various fractures sustained, and her last surgery was performed on her left forearm in September of 1979, at which time a plate and screws were inserted. The plate and screws will remain unless plaintiff develops some problem to necessitate removal, which problem has not occurred as of the time of trial.

Plaintiff's physical condition is permanent and stationary, and has been so for quite some time. The bulk of her medical care and treatment was received during the first

-2-

946

76T576T- PS 7-83

four or five months after this incident. Dr. Harvey Friedlander has been her main treating doctor. Since leaving the hospital on December 21, 1979, plaintiff has seen Dr. Friedlander, as follows: 4 times in 1980, with the last visit being November 24, 1980; the next visit was October 20, 1981, almost a year later. The next visit was in January of 1984, over two years later. She saw the doctor two more times in 1984, and has seen him twice in 1985, at least up to the time of trial. It thus appears from the record that there have been rather long periods of time when plaintiff has not required any medical attention or services.

Plaintiff has a loose fragment of bone in the knee, which may have to be surgically removed in the future, but no evidence as to when, or the anticipated cost thereof, or what disabilities could be expected therefrom, was offered; nor any evidence that in all medical probability it will be necessary to have the fragment removed. The same is true as respects the plate and screws remaining in plaintiff's left forearm.

Evidence was presented that plaintiff was born with club feet, and because of this condition, underwent some dozen or more surgeries in her early years, with an ultimate fusion being done on one or both of her feet, which has left plaintiff with almost no movement in the feet. At one of her last foot surgeries, her right ankle cord was surgically worked on. Her left foot is smaller than her right, which caused a slight limp.

Plaintiff had a prior facial problem, caused by dead facial nerves, which inhibits her ability to smile; due to

-3-

76T576T- PS 12-84

some limitation on her lip movements. Plaintiff had prior vision problems, and requires glasses for reading.

The residual effects of injuries sustained in the accident has effected her ability to walk and move about. Dr. Friedlander said that as she gets older, and as her leg muscles get weaker, this will cause her to walk shorter distances. The doctor also stated that because of her prior feet and leg problems, and regardless of the happening of this accident, that as she gets older, her muscles would weaken, that she would put on more weight, and would be required to walk shorter distances. The doctor said that the present atrophy of her legs from the knee down to the ankle in both legs, is pre-existing. He described it as marked atrophy, and said this could cause some limping. While the majority of her walking problems now and in the future are accident related, plaintiff nevertheless would have experienced some future problems with her walk or gait due to pre-existing feet and leg problems.

In closing argument plaintiff counsel made reference to the spinal injury of a quadraplegic, and in essence, compared plaintiff's physical condition and pain and suffering with that of a quadraplegic. While no objection was made by the defendant, the Court believes this argument was made in an effort to convince the jury that plaintiff's physical condition; her life style, her pain and suffering, is consistent with that of a quadraplegic. No evidence was received during the trial as to the physical or mental problems, or life style, of a quadraplegic; however, the Court believes that the limitations of a quadra-

-4-

76T576T- PS 12-84

plegic are so commonly known, that the jury could have placed plaintiff in the same category. However, the evidence clearly shows that plaintiff is not in the same category of a quadraplegic.

The evidence shows that plaintiff has been living alone in a small apartment since approximately October of 1982, that she can dress, feed and bath herself; that she can *USE* the bus *the* although it is with some difficulty; that she is able to go to the local market and shop; that she can go to her bank and handle her banking chores. She is right handed, and has regained the use thereof, including writing. That she can clean her apartment. An entry in Dr. Friedlander's medical records, made in January of 1985, indicated that in December of 1984, that plaintiff had fallen cleaning her cabinets, while standing on a chair. Plaintiff sustained a minor injury to her right shoulder in this fall. Plaintiff has a TV set in her apartment and is able to operate it. That she did all of these activities with the aid of a wheelchair, or walker, and braces, at least up to about May of 1985. In May of 1985, Dr. Friedlander prescribed an electric cart for her, which plaintiff secured, which she brought to court with her, and which she used while in court. The cart is battery operated. Plaintiff demonstrated to the Court and jury, her use of this cart. It appeared to the Court, as it must have to the jury, that she could handle this cart quite well, and this cart should be a much better means of transportation for her, as opposed to a walker and braces, or a wheelchair. Dr. Friedlander said he felt the use of this electric cart would benefit the plaintiff; and plaintiff and

-5-

76T576T- PS 12-84

her mother both stated that she now uses it most of the time, except for very short distances. While the use of the wheelchair is difficult for plaintiff, due to weakness and pain, this electric cart will enable plaintiff to move around in much better fashion than before with the wheelchair or walker. Plaintiff has been taught how to recharge the batteries, and has been doing so. Plaintiff is not in the same physical category of a quadraplegic, nor does she require the ~~content~~ CONSTANT care and observation that is needed with quadraplegics. The evidence would indicate that plaintiff has rehabilitated herself fairly well, considering the severe injuries that she sustained.

Plaintiff and her mother both testified that plaintiff is unable to care for her six year old daughter, Mary Ann. She has not been able to do so since her accident. The question of whether plaintiff will ever be able to care for this child was covered during testimony. When plaintiff's mother, Mrs. Gikas, was testifying about Mary Ann (whom the mother is taking care of), and as to plaintiff's ability to care for the child in the future, Mrs. Gikas replied "only time will tell." Plaintiff counsel, among other things, stressed this item of emotional damage in his closing argument, yet the state of the evidence would suggest that with time, plaintiff may be able to care for this youngster, considering the extent to which plaintiff has rehabilitated herself to date.

(2) The loss of earnings from the date of the accident (past and future) do not justify the verdict. The evidence introduced in connection with the plaintiff's loss of income

/ / /

-6-

950

to the present, and in the future, was questionable and subject to speculation.

Evidence was offered that showed plaintiff was a "C" student in high school; and that the high school she graduated from was for the physically impaired because of social difficulties. During the ensuing five years after graduation from high school, plaintiff did not attend any college classes, nor any nursing classes. Plaintiff and her mother testified that plaintiff wanted to become a Licensed Vocational Nurse (LVN). Plaintiff had not received any training towards this goal before the accident, except perhaps some observation of what an LVN might do, when she worked as a nurses aid. The evidence showed plaintiff was not employed at the time of the accident. Plaintiff and Mrs. Gikas both stated that plaintiff was hoping to return to school in September of 1979 or early 1980, and was hoping to enter Pierce Junior College or a Canoga Park school. But plaintiff had not applied for admission before this accident, nor did Mrs. Gikas see any paper work in connection therewith.

Plaintiff's work history at best was sketchy, and very short. Her longest period of employment was about nine months as a nurses aid for Canoga Terrace, and she was making minimum wages (couple dollars an hour). She worked for an old age convalescent home for three or four months, but no evidence was offered as to what she earned. She took training at Blue Cross for the position of a claim examiner, but couldn't pass the test. Her mother also said she took care of small children for a short period of time, but could not recall what she earned

-7-

76T576T- PS 12-84

**1206**

when she did this. Plaintiff testified it would have taken her two years to become an LVN. In the light of plaintiff's prior educational and work history, as to whether plaintiff would have made it as an LVN, and then worked as such for the next thirty years or so, is very much in the realm of speculation.

Plaintiff attorney in closing argument asked the jury for $91,520.00 as wage loss for four years to date of trial, and the sum of $973,440 for loss of earning capacity in the future -- based on what she could have earned as an LVN -- a total of over one million dollars for past and future wage or income loss. At best, plaintiff's evidence regarding past and future loss of earnings was speculative, or merely possible, and certainly not the type of evidence that would show with some degree of reasonable certainty that such losses would follow from this accident.

The evidence introduced regarding loss of earnings (past and future) do not justify the verdict rendered.

(3) As the Court stated before, there is no dispute that this plaintiff sustained severe and disabling injuries, some of which are permanent in nature. Even conceding this, the Court has weighed the evidence, and based on the entire

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

-8-

76T576T- PS 12-84

record, has concluded that the jury should have reached a different verdict. The Court, in the exercise of its independent judgment, determines that $2,500,000.00 is fair and reasonable, in the light of the evidence.

Dated: AUG 21 1985

MAURICE R. HOGAN, JR.
Judge of the Superior Court

MRH :emg

-9-

76T576T- PS 12-84