[Civ. No. 22844. Third Dist. June 29, 1984.]

JAN ARIN FRANCK, Plaintiff and Appellant, v.
POLARIS E-Z GO DIVISION OF TEXTRON, INC.,
Defendant and Appellant.

**COUNSEL**

Price, Burness, Price, Davis & Brown and Robert L. Davis for Plaintiff and Appellant.

Neil M. Levy, Leonard Sacks, Wylie A. Aitken, Harlan Arnold, Glen T. Bashore, Ray Bourhis, Richard D. Bridgman, Edwin Train Caldwell, Robert E. Cartwright, David S. Casey, Jr., Victoria J. De Goff, J. Nick DeMeo, Harry J. Delizonna, Douglas K. deVries, Paul A. Eisler, Sanford M. Gage, Allan F. Grossman, Ian Herzog, G. Dana Hobart, Stanley K.

Jacobs, Harvey R. Levine, John C. McCarthy, Timothy W. Peach, Joseph Posner, Roberta Ritter, John M. Van Dyke, Arne Werchick and Stephen I. Zetterberg as Amici Curiae on behalf of Plaintiff and Appellant.

Toy & Coleman and John R. Toy for Defendant and Appellant.

## OPINION

**CARR, J.**—In this appeal we consider an issue of first impression: the proper reduction of a damages award against a nonsettling tortfeasor under Code of Civil Procedure section 877 when plaintiff and other defendants agree to a structured settlement calling for future periodic payments.

Defendant Polaris E-Z Go Division of Textron, Inc., (Polaris) was found liable for injuries sustained by plaintiff while riding on a snowmobile manufactured by Polaris. Damages were assessed at $300,000.

Prior to trial, plaintiff settled with defendants Todd and Robert Weichers (respectively, the driver and owner of the snowmobile) for a total of $215,000. Under the settlement they agreed to pay $25,000 upon court approval of the settlement and a total of $190,000 in future periodic payments, commencing in 1983 and continuing until the year 2000. The Weichers' insurance had a single accident coverage limit of $100,000. After paying $25,000, the insurance company used the balance of $75,000 to purchase an annuity contract that would finance the future payments of $190,000. Another defendant, the seller of the snowmobile, settled for a lump sum payment of $2,500. The court approved the settlement.

After finding against Polaris and fixing damages at $300,000, the trial court was requested by both parties to determine, in light of the settlement agreement, the amount by which the damages award should be reduced pursuant to Code of Civil Procedure section 877, subdivision (a). Plaintiff contended the award should be reduced only by the amount of cash presently paid under the settlement and the *present cash value or cost* of future payments ($102,500: $2,500 cash from seller; $25,000 cash from Weichers; $75,000 premium for annuity). Polaris contended the award should be reduced by the *total amount to be paid* under the settlement agreement ($217,500: $2,500 cash from seller; $25,000 cash from Weichers; $190,000 in future payments). The trial court decided in favor of Polaris.

Plaintiff appeals from the damages portion of the judgment. Polaris cross-appeals from the portion of the judgment finding it liable for plaintiff's injuries.

FACTS

On January 23, 1977, plaintiff Jan "Cricket" Franck, then 11 years old, was riding on a snowmobile with her friend, Stephanie Weichers, and Stephanie's brother, Todd. Todd was driving and plaintiff was seated at the rear of the snowmobile. As the snowmobile went over a bump, plaintiff felt it tilt toward her right. She put her right foot on the ground to steady herself. As she did so, she felt her foot being sucked into the underside of the snowmobile. She fell to the ground and the snowmobile stopped. When the snowmobile came to a rest, plaintiff was lying on the ground with her right foot lodged in the moving track portion at the rear of the machine. According to Todd and Robert Weichers (Todd's father), her foot rested in the space between the top of the track belt and the underside of the frame.

After removing several bolts, Robert was able to extract plaintiff's foot from the machine. She was taken to a Redding hospital with a fractured tibia and fibula and an open wound where the bone penetrated the skin. Because of healing problems and other complications plaintiff was in and out of casts and had various surgeries over a period of five years. By the time of trial, she still had a problem with arthritis as a result of the accident. Her condition could get worse as she aged, eventually requiring surgical intervention.

At trial, plaintiff presented evidence to show the snowmobile was defectively designed and that such defect caused her injuries. Plaintiff's expert demonstrated that a galosh-covered foot placed near the moving track in the manner described by plaintiff is easily snagged by sharp-edged metal cleats attached to the track and pulled into the same position inside the machine as the Weichers described. He testified the sharp points of the cleats could have been rounded off without affecting the performance of the snowmobile.

Polaris' experts testified the cleats were deliberately designed with sharp edges to increase lateral stability. Their theory was that plaintiff's foot was not snagged, but that she inadvertently pushed her foot into the area *within* the circular belt track (rather than between the upper part of the track and the frame) where it became wedged. Polaris could not have provided any more guarding over the track area and still have a functioning machine.

The trial court found the sharp metal cleats of the snowmobile were defectively designed or defectively guarded and such defectively designed cleats proximately caused plaintiff's injuries by snagging her foot and pulling it into the snowmobile's suspension system above the track belt. The court found plaintiff sustained damages of $300,000. Subtracting the total

amount of the settlement, the court entered judgment against Polaris for $82,500.

## I

We first consider Polaris' cross-appeal on the issue of liability. Polaris contends there is no evidence the snowmobile was defective or, if defective, that it proximately caused plaintiff's injuries.

■ A manufacturer may be held liable for a defectively designed product "(1) if the plaintiff demonstrates that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner, or (2) if the plaintiff proves that the product's design proximately caused his injury and the defendant fails to prove, . . . that on balance the benefits of the challenged design outweigh the risk of danger inherent in such design." (*Barker* v. *Lull Engineering Co.* (1978) 20 Cal.3d 413, 435 [143 Cal.Rptr. 225, 573 P.2d 443, 96 A.L.R.3d 1].) Factors to be considered in the latter prong of the test include "the gravity of danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design." (*Id.,* at p. 431.)

■ When a party attacks a trial court's factual finding on the ground there is no substantial evidence to support it, " 'the power of an appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence contradicted or uncontradicted which will support the finding of fact.' [Citations.] [¶] ■ 'It is well established that a reviewing court starts with the presumption that the record contains evidence to sustain every finding of fact.' [Citations.] ■ Defendants' contention herein 'requires defendants to demonstrate that there is *no* substantial evidence to support the challenged findings.' (Italics added.)" (*Foreman & Clark Corp.* v. *Fallon* (1971) 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362].)

As to both challenged findings, Polaris cites only evidence favorable to its position. "A recitation of only defendants' evidence is not the 'demonstration' contemplated under the above rule. [Citation.] Accordingly, if, as defendants here contend, 'some particular issue of fact is not sustained, they are required to set forth in their brief *all* the material evidence on the point and *not merely their own* evidence. Unless this is done the error is deemed waived.' (Italics added.)" (*Ibid.*)

■ Initially, Polaris contends there is no evidence to support the trial court's finding the track of the snowmobile was defectively guarded. How-

ever, the court's statement of decision is made in the alternative, with a finding the metal cleats were defectively guarded *or defectively designed.* Polaris cites only evidence of the *guarding* of the track. There is substantial evidence from plaintiff's expert that the sharp corners of the metal cleats constitute a defective *design* which proximately caused plaintiff's injuries. Plaintiff's expert showed the foot of a rear passenger could easily be snagged by the sharp corners of the cleats and swept into the machine. He concluded the danger could be substantially reduced by rounding off the corners, without adversely affecting the performance of the machine. Polaris' experts testified the sharp corners contributed to lateral stability, primarily on hard snow and ice. There is no indication the snowmobile was not being operated in an intended or reasonably foreseeable manner.

This evidence provides substantial support for a finding of liability under both prongs of the *Barker* test: (1) the machine failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner; (2) the sharp-edged design of the cleat proximately caused the injury and on balance the benefits of the design do not outweigh the risk of danger inherent in the design.

█ Polaris next contends the court's finding of proximate cause is not supported by the evidence as it is based on an impossible fact situation. In the tests conducted by plaintiff's expert with an artificial foot, it was shown that when the foot is caught by the cleats and swept into the machine, it is deeply lacerated. Plaintiff's foot was not lacerated, and Polaris asserts it is impossible for her injury to have occurred in the manner found by the trial court.

Again Polaris cites only evidence in favor of its contention. In the expert's tests, the foot was covered only with a galosh. Plaintiff was wearing socks under her galoshes at the time of the accident. Her expert testified that thick socks might prevent the lacerations which occurred in his tests. He also testified that if the driver released the throttle at the same time a person's foot was pulled into the machine, there would be less likelihood of lacerations. From the evidence this is what occurred: Todd fell off the snowmobile at the same time as plaintiff. The absence of lacerations on plaintiff's foot does not present an impossible fact situation.

Polaris' final contention on cross-appeal is that the award of $300,000 is excessive as a matter of law. █ An award may be overturned "[w]hen the award as a matter of law appears excessive, or where the recovery is so grossly disproportionate as to raise a presumption that it is the result of passion or prejudice, . . ." (*Cunningham* v. *Simpson* (1969) 1 Cal.3d 301, 308-309 [81 Cal.Rptr. 855, 461 P.2d 39].)

Polaris failed to raise this issue below in a motion for new trial. ■ It is well established that " '[t]he point that damages are excessive cannot be raised for the first time on appeal, but must be presented to the lower court on the motion for new trial.' Consequently defendants, having failed to move for a new trial, cannot now contend that the award of damages is excessive." (*Schroeder* v. *Auto Driveaway Co.* (1974) 11 Cal.3d 908, 918 [114 Cal.Rptr. 622, 523 P.2d 662]; *Bate* v. *Jolin* (1929) 206 Cal. 504, 508 [274 P. 971]; *Glendale Fed. Sav. & Loan Assn.* v. *Marina View Heights Dev. Co.* (1977) 66 Cal.App.3d 101, 122 [135 Cal.Rptr. 802].)

■ Had the point been properly raised below, Polaris fails to show the award is excessive as a matter of law or is the result of passion or prejudice, again citing evidence in favor of its position. Polaris fails to mention the pain and suffering plaintiff must have felt over the five years of periodic surgery and castings; the impairment to her normal activities throughout most of her teenage years; the possible impairment to her future activities, and the probability of future worsening arthritis. Under these circumstances, an award of $300,000 is not excessive as a matter of law.

Accordingly, the judgment as to Polaris' liability is affirmed.

II

■ Section 877, subdivision (a), of the Code of Civil Procedure provides: "Where a release, dismissal with or without prejudice, or a covenant not to sue or not to enforce judgment is given in good faith before verdict or judgment to one or more of a number of tortfeasors claimed to be liable for the same tort—[¶] (a) It shall not discharge any other such tortfeasor from liability unless its terms so provide, but it shall reduce the claims against the others in the amount stipulated by the release, the dismissal or the covenant, or in the amount of the consideration paid for it whichever is the greater; . . ."

At issue here is the amount of reduction to which a nonsettling tortfeasor is entitled in the case of a structured settlement calling for future periodic payments. Polaris contends we must literally read the words "amount stipulated by the release" and reduce the award by the total amount of future payments stipulated in the settlement agreement. Plaintiff and amicus curiae California Trial Lawyers Association contend the future payments must be discounted to their present cash value to arrive at the amount of reduction to which Polaris is entitled. We agree with plaintiff and amicus curiae.

Our consideration of this issue is guided by two policy interests strongly supported in the law. First is the maximization of recovery to the plaintiff

for the amount of her injury to the extent that negligence or fault of others has contributed to it. Second is the encouragement of settlement of claims, a policy reflected in section 877. (*Sears, Roebuck & Co.* v. *International Harvester Co.* (1978) 82 Cal.App.3d 492, 496 [147 Cal.Rptr. 262]; see also *American Motorcycle Assn.* v. *Superior Court* (1978) 20 Cal.3d 578, 605-606 [146 Cal.Rptr. 182, 578 P.2d 899]; *Mill Valley Refuse Co.* v. *Superior Court* (1980) 108 Cal.App.3d 707, 711 [166 Cal.Rptr. 687]; *Stambaugh* v. *Superior Court* (1976) 62 Cal.App.3d 231, 236 [132 Cal.Rptr. 843].)

Plaintiff has obtained a judgment of $300,000; therefore she *presently* is entitled to recover that amount. It is simple economics that money received by plaintiff in the year 2000 is not worth as much as the same amount of money if she received it today. If we discount the award by the total amount of future payments ($190,000), in the year 2000 plaintiff will have received a total amount of money that is presently worth less than $300,000. Only by discounting the future payments to their present cash value and reducing the award by that amount will plaintiff receive the recovery to which she *presently* is entitled.[1]

The unfairness of Polaris' approach is demonstrated by consideration of the hypothetical situation wherein a plaintiff obtains a structured settlement for future payments in an amount *equal* to the judgment award against a nonsettling tortfeasor. Under Polaris' theory, the nonsettling tortfeasor would be completely relieved of liability and the plaintiff would have only a settlement worth much less than the amount to which he or she is entitled at the time of judgment.

Polaris complains that if the future payments are reduced to their present cash value, plaintiff will receive a tax "windfall" because the future payments will not be subject to federal income taxation (26 U.S.C. § 104 (a)(2)) but if plaintiff received the present value in a lump sum and invested it in an annuity, the income derived therefrom would be taxable.

This consideration is irrelevant. Congress and the Legislature provide many tax benefits, and each instance reflects a policy decision to benefit the recipient of the particular type of income in question. If a plaintiff seeks damages to compensate for future lost income, the jury may not be instructed to account for the fact that a damages award is not taxable. There are several reasons for this rule. First, "it is irrelevant in terms of the defendant's obligation to pay damages if liability is established; any lack of tax

---

[1]That money received in the future is worth less than at the time of judgment is recognized in judgments themselves, which, as in this case, typically add interest to the award at a rate calculated from the date of judgment.

due is a matter involving only the plaintiff and the government; a defendant may not seek benefit therefrom." (*Rodriguez* v. *McDonnell Douglas Corp.* (1978) 87 Cal.App.3d 626, 666 [151 Cal.Rptr. 399].) Second, "to inform the jury of nontaxability of the award, would constitute a 'nullification' of federal congressional intent to benefit the injured party." (*Ibid.*) Third, "the introduction of evidence of future tax consequences to affect the amount of an award in personal injury and wrongful death actions would open the door to *intense speculation* about the future on the part of the jury. The ramifications of such a rule of law could be immense." (*Id.*, at p. 667; original italics.)

These considerations apply with equal force to this case. Plaintiff is free to negotiate a settlement according to her best interests, financial or otherwise. (*Stambaugh, supra,* 62 Cal.App.3d at p. 238.) Polaris should not receive a "windfall" because plaintiff takes advantage of the tax benefits legally available to her. To hold that Polaris' liability should be reduced because of the favorable tax treatment Congress chose to confer on tort plaintiffs would effectively nullify congressional policy.

Moreover, Polaris' position would require speculation of the most amorphous nature. We cannot predict what the tax consequences would be over the next 17 years if plaintiff received a presently valued lump sum rather than future periodic payments. She would be free to invest the money in any way that minimizes taxation of the income derived therefrom. Nor can we speculate as to such matters as her future wages; her future tax bracket; the deductions and exemptions that will be available to her; or any other factor that affects the amount of one's taxable income. What Congress confers, Congress can take away. Thus Congress could decide to repeal the tax advantage presently conferred on tort plaintiffs.

Accordingly, the tax considerations put forth by Polaris have no relevancy to the issue before us.

 To ensure that plaintiff receives the full recovery to which she was entitled at the time of judgment, the amount by which the damages award is reduced must be the present cash value of future payments under the structured settlement.

The second consideration on this issue is the need to encourage settlement of claims. " '[I]t is the policy of the law to discourage litigation and to favor compromises of doubtful rights and controversies, made either in or out of court.' " "Settlement agreements " 'are highly favored as productive of peace and goodwill in the community, and reducing the expense and persistency of litigation.' " " "Indeed, it has been said that a major goal of

section 877 is the 'encouragement of settlements.'" (*Stambaugh* v. *Superior Court, supra,* 62 Cal.App.3d at p. 236.)

 Structured settlements appeared on the California scene quite recently and are becoming increasingly commonplace. (Leland, *Periodic Payments* (Aug. 1983) 3 California Lawyer 33.) Such settlements have advantages for both plaintiffs and defendants. Plaintiffs receive tax-free periodic income over a period of time, thereby preventing recoveries from being squandered and ensuring that money is received in the future at times when it is actually needed. Defendants, on the other hand, are able to offer plaintiffs large settlements at a relatively small up-front cost by spreading payments out over a period of years through an annuity. These factors work to further encourage settlements. (*Id.,* at pp. 33-37.)

 The interpretation of section 877 urged by Polaris would work diametrically against the purpose of section 877 by discouraging structured settlements in multiple defendant cases. Few plaintiffs would be willing to enter into structured settlements unless they could obtain future payments large enough to cover the possibility of a nonsettling defendant being relieved of paying damages. The large amounts demanded by plaintiffs would in turn discourage defendants from settling. Using tax considerations to reduce a nonsettling defendant's liability would further discourage structured settlements by nullifying their tax advantage. Moreover, Polaris' interpretation of the law would considerably lessen the incentive for nonsettling defendants to settle. If a plaintiff settles with other defendants for large future payments, a nonsettling defendant will be more willing to go to trial on the chance that the court will find damages in an amount equal to or less than the amount of future payments under the settlement. Such a system would effectively reward defendants with liability for not settling.

Accordingly, consideration of the policy encouraging settlement of claims underlying section 877 compels us to conclude Polaris is entitled to a reduction in its liability only in the amount of the present cash value of future payments under the structured settlement.

Evenhandedness in the treatment of damages further compels our conclusion. When fixing damages for future pecuniary loss, juries are instructed to discount such future loss to its present cash value. (BAJI No. 14.70 (6th ed. 1977).)[2] A plaintiff who wins a recovery at trial for future loss must take

---

[2]BAJI No. 14.70 provides: "Any [award for] [finding of] future pecuniary loss must be only for its present cash value. [¶] Present cash value is the present sum of money which, together with the investment return thereon when invested so as to yield the highest rate of return consistent with reasonable security, will pay the equivalent of lost future benefits at the times, in the amounts, and for the period that you find such future benefits would have been received. [¶] The present cash value will, of course, be less than the amount you find to be the loss of such future benefits."

an award reduced to its present cash value. Yet, under Polaris' theory, if that plaintiff settles with a codefendant for future payments designed to help compensate for future loss, the nonsettling defendant would *presently* receive the benefit of the full amount of future payments in reducing the presently valued judgment award, rather than the present cash value. This is not only unfair to plaintiffs and would further discourage settlement but would also result in cases wherein plaintiffs are not fully compensated for their future loss. To illustrate, if a plaintiff settled with a codefendant for future payments in a total amount less than plaintiff's future loss, but equal to or greater than the *present value* of that loss, the nonsettling defendant would be relieved of liability if judgment is rendered against him for that present value; the plaintiff is thereby not fully compensated for future loss.

Polaris further contends its interpretation of section 877 is mandated by the language of the statute which calls for a reduction of the award by "the amount stipulated by the release" or "the amount of the consideration paid for it," whichever is greater. Polaris asserts the Legislature recognized that structured settlements would actually be "paid for" by annuity premiums and that this provision was included to ensure that the discount would be measured by the total amount of future payments stipulated by the settlement rather than the amount paid to purchase the annuity.

Polaris provides no legislative history to support this contention nor do we find it persuasive. Section 877 was enacted in 1957 (Stats. 1957, ch. 1700, § 1, p. 3077), at least 16 years before the first known structured settlement in California. (Leland, *Periodic Payments, supra,* at p. 33.) We do not believe an omniscient Legislature, in enacting section 877, foresaw the advent, years later, of the structured settlement innovation of handling tort claims. We are persuaded that when enacted this provision was intended to prevent fraud and double recovery by plaintiffs. A plaintiff and a settling defendant might agree to state an amount in the settlement agreement less than that actually paid by the defendant. If an award against a nonsettling defendant is only reduced by the amount stated in the agreement, plaintiff would receive a double recovery. The language of section 877 protects a nonsettling defendant from having the award reduced by an amount less than that stipulated in the agreement when, for whatever reason, a settling defendant pays less than the amount stipulated.

Accordingly, we hold that when a plaintiff and one or more codefendants in a tort action enter into a structured settlement calling for future periodic payments, the amount by which the judgment award against a nonsettling defendant is reduced under section 877, subdivision (a), of the Code of Civil Procedure shall be the present cash value of the future payments. Polaris is entitled to a reduction in the $300,000 award of the amount of cash presently

paid to plaintiff under the settlement ($27,500) plus the present cash value of $190,000 in future payments.

Plaintiff would have us determine that the $75,000 premium paid for the annuity constitutes the present cash value of the future payments. Without more evidence, we cannot make such a determination. This is a question which should be determined by the trial court on remand.

The judgment of the trial court as to the liability of Polaris for plaintiff's injuries is affirmed. The portion of the judgment with respect to net damages against Polaris is reversed and remanded with instructions to the trial court to take evidence on and determine the present cash value of future payments to be made under the settlement agreement, and to render judgment in an amount which represents the difference between $300,000 less the present cash payments plus the present cash value of the future judgments.

Regan, Acting P. J., and Sims, J., concurred.