Filed 9/29/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| DIONNE LICUDINE, | B268130 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC499153) |
| v. | |
| CEDARS-SINAI MEDICAL CENTER et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Charles F. Palmer, Judge. Affirmed.

Horvitz & Levy, David M. Axelrad and Emily V. Cuatto, and Moore McLennan, Raymond R. Moore and Drew N. Evans for Defendants and Appellants.

Howard A. Kapp for Plaintiff and Respondent.

\* \* \* \* \* \*

During her senior year of college, plaintiff Dionne Licudine (plaintiff) suffered injury during a gallbladder surgery that will have lifelong repercussions. She sued for malpractice, and sought damages for the resulting diminution in her earning capacity. Before such damages may be awarded, a jury must (1) find the injury that the plaintiff sustained will result in a loss of earning capacity, and (2) assign a value to that loss by comparing what the plaintiff could have earned without the injury to what she can still earn with the injury. (See *Fein v. Permanente Medical Group* (1985) 38 Cal.3d 137, 153 (*Fein*); *Storrs v. Los Angeles Traction Co.* (1901) 134 Cal. 91, 93 (*Storrs*).) The first, threshold requirement is met only if the plaintiff is "reasonably certain to suffer a loss of future earnings." (*Robison v. Atchison, T. & S. F. R. Co.* (1962) 211 Cal.App.2d 280, 287-288 (*Robison*).) But how certain must the jury be in fixing what the plaintiff could have earned without the injury? We know that a jury may not award "speculative damages" (*Ferguson v. Lieff, Cabraser, Hiemann & Bernstein* (2003) 30 Cal.4th 1037, 1048 (*Ferguson*)), and the cases reviewing lost earning capacity awards seem to apply a consistent, yet unstated standard. No case has yet articulated what that standard is. Today, we hold that the jury must fix a plaintiff's future earning capacity based on what it is "reasonably probable" she could have earned. Because the plaintiff in this case did not adduce any evidence to establish that it was "reasonably probable" she could have obtained employment as an attorney or any evidence on the earnings of lawyers, the trial court did not abuse its discretion in determining that the jury's $730,000 award for lost earning capacity was not supported by substantial evidence. What is more, given the unusual facts of this case, the court acted within its discretion in granting a new trial on damages rather than entering a judgment notwithstanding the verdict for the defendants. We consequently affirm the grant of a new trial on damages, and provide additional guidance as to a handful of evidentiary issues likely to arise during the retrial.

**FACTS AND PROCEDURAL BACKGROUND**

I.      **Facts**

In January 2012, plaintiff was a senior at the University of Southern California (USC) with a double major in political science and international relations. She was also

the coxswain and captain of USC's women's rowing team, and stood a legitimate chance of being named to the national rowing team. She was planning to apply to law school to fulfill her "passion" to be a human rights lawyer.

On February 6, 2012, plaintiff underwent surgery at defendant Cedars-Sinai Medical Center (Cedars). She had been experiencing sharp abdominal pains over the prior few years, and the doctors at Cedars recommended the removal of her gallbladder. The surgery was supposed to be minimally invasive: The surgeons were to make a small incision in her abdomen, place a hollow tube into the incision, introduce a small camera and the necessary surgical instruments into her abdomen through the tube, and then conduct the surgery.

When inserting the tube, however, defendant Ankur Gupta (Dr. Gupta) nicked a vein and caused substantial internal bleeding. This necessitated a change in plans. In order to repair the vein, extract the blood, and remove plaintiff's gallbladder, the attending physicians cut a six-inch opening in her abdomen. Although her gallbladder was successfully removed, the more invasive surgery necessitated an additional four weeks in the hospital, including a week in the intensive care unit. What is more, the saturation of plaintiff's digestive organs in her blood caused fibrous tissue called adhesions to form on and around those organs, which has resulted in pain, bloating and dysfunction in her digestive tract.

## II. Procedural History

### A. *Lawsuit*

Plaintiff sued Cedars and Dr. Gupta for malpractice.[1]

### B. *Evidence at trial*

The matter proceeded to trial in May 2015.

At trial, plaintiff testified that she was able to return to school and graduate from USC in the spring of 2012, albeit with help from her mother, dispensation from her

---

[1]     Plaintiff also sued the Regents of the University of California and another doctor who supervised Dr. Gupta during the surgery. Plaintiff voluntarily dismissed the Regents, and dismissed the other doctor by stipulation.

3

teachers, and use of an electronic wheelchair. Plaintiff also applied to, and was accepted by, four law schools to start in the fall of 2013. Two of the law schools—Suffolk Law School and New England School of Law—were in Boston, which plaintiff preferred so she could participate in the Boston rowing community. She explained that she did not apply to Harvard Law School because she did not have "straight As." Plaintiff also applied to, and was accepted into, the Masters of Public Administration program at Pennsylvania State University. Plaintiff accepted the offers from Suffolk Law School and Penn State, and thereafter requested and was granted medical deferments of her start date. In the meantime, plaintiff worked for two years as an assistant rowing coach, earning $1200 a month.

Plaintiff's former rowing coach testified that more than half of the women who have served as coxswains have gone on to graduate school.

Plaintiff also called an expert witness in internal medicine. The expert opined that plaintiff's ongoing gastrointestinal problems would likely be with her for the rest of her life and that she will "continue to suffer pain, require medical evaluations, require medication, and may at some point require an emergent surgical operation for a[n] acute abdominal event." The expert further opined that these consequences "would certainly impact [her] lifestyle decisions[,] including career choice [and] education."

Plaintiff asked the trial court to take judicial notice of a print-out from the website of the United States Bureau of Labor Statistics (Bureau). The print-out indicated that the "median" annual salary for attorneys in 2012 was $113,530, but noted that "competition" for attorney positions was "strong[] because more students are graduating from law school each year than there are jobs available." Although plaintiff filed her request prior to trial, the court entertained argument on the issue intermittently throughout the trial, and did not deny the request until all parties had rested. The court ultimately denied plaintiff's request on the ground that the power to judicially notice official government documents did not reach "the truth of the matter[s]" stated in those documents and that, as a result, the print-out's probative value was substantially outweighed by the danger of confusing the issues and misleading the jury.

4

## C.    *Jury verdict*

The jury returned a special verdict form finding Cedars and Dr. Gupta negligent, and awarded plaintiff a total of $1,045,000 in damages.  More specifically, the jury awarded plaintiff $285,000 in past economic loss, $730,000 in future economic loss, $15,000 for past non-economic loss, and $15,000 for future non-economic loss.

## D.    *Posttrial motions*

Cedars and Dr. Gupta (collectively, defendants) moved for a new trial and for judgment notwithstanding the verdict on several grounds, including the insufficiency of the evidence to support the jury's award of economic damages.  Plaintiff moved for a new trial due to the inadequacy of the jury's award of non-economic damages.

The trial court granted both motions for a new trial on damages and denied defendants' motion for judgment notwithstanding the verdict.  With respect to the jury's award of economic damages, the court stated that "there was virtually no evidence" to support the jury's $285,000 award of lost earnings "prior to verdict" and that the jury's award of $730,000 for plaintiff's loss of earning capacity was "speculative and excessive" because "there was no evidence whatsoever of the compensation earned by graduates of any law school, much less the law school plaintiff chose to attend, or compensation of any attorneys, no matter how experienced."  With respect to the jury's award of non-economic damages, the court concluded that the jury's meager award of $30,000 *total* for past and future pain and suffering was "grossly inadequate" in light of evidence of the "excruciating pain" she would have to endure "on a daily basis for the rest of her life."

Defendants filed a timely notice of appeal.

## DISCUSSION

Defendants appeal the trial court's order denying their motion for judgment notwithstanding the verdict, arguing that (1) there was insufficient evidence to support plaintiff's claim for loss of earning capacity, and (2) the remedy for this lack of evidence is the entry of judgment awarding no such damages, not a new trial on damages.  Plaintiff disputes both arguments.  A party is entitled to judgment notwithstanding the verdict only

5

if there is "no substantial evidence [to] support" that verdict. (*Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th 62, 68 (*Sweatman*); Code Civ. Proc., § 629.) In reviewing a trial court's denial of a motion for judgment notwithstanding the verdict, we ask: Does the record, viewed in the light most favorable to the jury's verdict, contain evidence that is reasonable, credible and of solid value sufficient to support the jury's verdict? (*King v. State of California* (2015) 242 Cal.App.4th 265, 288; *CADC/RADC Venture 2011-1 LLC v. Bradley* (2015) 235 Cal.App.4th 775, 787.) If we must resolve any legal issues in answering this question, our review of such issues is de novo. (*King*, at p. 288.)

## I.     Forfeiture

As a threshold matter, plaintiff argues that defendants have forfeited their right to challenge the trial court's denial of their motion for judgment notwithstanding the verdict because they only generally attacked the sufficiency of the evidence, and did not specifically argue that plaintiff failed to introduce evidence quantifying her lost earning capacity. To be sure, a party attacking a jury's award of damages as excessive must first give the trial court the opportunity to consider the argument before raising that argument on appeal. (E.g., *Franck v. Polaris E-Z Go Div. of Textron, Inc.* (1984) 157 Cal.App.3d 1107, 1115-1116.) However, defendants did just that. Not only did defendants attack the jury's award of $730,000 for the future loss of earning capacity as "speculative" (and hence "excessive"), they specifically asserted that plaintiff never introduced evidence that she was "reasonably certain to earn some definable amount of income." In other words, defendants argued that plaintiff never quantified her lost earning capacity. There was no forfeiture.

## II.     Substantial Evidence

To assess whether the jury's award of damages for loss of earning capacity was supported by substantial evidence, we must (1) know what standard the jury must apply in awarding such damages, and (2) evaluate whether the evidence meets that standard.

6

## A. Standard for assessing loss of earning capacity

### 1. Compensatory damages in general

A person who "suffers" a "loss or harm" to her person or property due to another's "unlawful act or omission" may sue for "damages" that "compensate" for all of the loss or harm proximately caused by that act or omission. (Civ. Code, §§ 3281-3283 & 3333; accord, *Meister v. Mensinger* (2014) 230 Cal.App.4th 381, 396 ["'Damages' are the monetary compensation awarded to parties who suffer detriment for the unlawful act or omission of another"].) Damages encompass losses or harms that occurred prior to trial as well as losses or harms "certain to result in the future." (Civ. Code, § 3283.) Once a jury determines that an injured party is entitled to damages, the "focus of an award of damages [turns to] the quantification of detriment suffered by a party." (*Meister*, at p. 396.) "Damages must, in all cases, be reasonable." (Civ. Code, § 3359; *Bermudez v. Ciolek* (2015) 237 Cal.App.4th 1311, 1328.)

Compensable damages are categorized as either "general" or "special." General damages are those damages that "necessarily result from the act complained of." (*Beeman v. Burling* (1990) 216 Cal.App.3d 1586, 1599.) Put differently, general damages "flow from the injuries received." (*Treadwell v. Whittier* (1889) 80 Cal. 574, 581.) Consequently, general damages are "implied by law" (*Beeman*, at p. 1599), and may be "inferred from the nature of the injury" itself (*Connolly v. Pre-Mixed Concrete Co.* (1957) 49 Cal.2d 483, 489 (*Connolly*); *Hilliard v. A. H. Robins Co.* (1983) 148 Cal.App.3d 374, 412 (*Hilliard*)). General damages include damages for "'pain [and] suffering, emotional distress, and other forms of detriment that are sometimes characterized as subjective or not directly quantifiable.' [Citation.]" (*Beeman*, at p. 1599; *Thayer v. Kabateck Brown Kellner LLP* (2012) 207 Cal.App.4th 141, 156.) By contrast, special damages do not necessarily arise from the typical infliction of the injury and are instead the "out-of-pocket losses" "'peculiar to the infliction of each respective injury.'" (*Beeman*, at p. 1599.) Special damages include medical and related expenses as well as lost income. (*Ibid.*; Rest.2d Torts, § 924.)

When a plaintiff's injury interferes with her professional earnings, she can potentially recover general damages, special damages, or both. Retrospectively, she can seek the "loss of wages between the occurrence of the injury and the trial"; these are special damages. (*Swanson v. Bogatin* (1957) 149 Cal.App.2d 755, 758.) Prospectively, she can seek to recover for her loss of earning capacity; these are general damages. (*Connolly*, *supra*, 49 Cal.2d at p. 489 ["Loss of earning power is" "awarded for the loss of ability thereafter to earn money" and "is an element of general damages"]; *Zibbell v. Southern Pacific Co.* (1911) 160 Cal. 237, 251-252 (*Zibbell*).)

### 2. *Damages for loss of earning capacity*

A jury tasked with evaluating a plaintiff's prayer for prospective loss of earning capacity must answer two questions: (1) Did the plaintiff suffer a loss in her earning capacity as a result of her injury; and if so, (2) How is that loss to be valued?

### a. *Entitlement to damages for loss of earning capacity*

The first question assesses whether the plaintiff's earning capacity was, in fact, damaged at all. It is a threshold question of entitlement. Consistent with the statutory requirement that a plaintiff is eligible only to recover damages for losses "certain to result in the future" (Civ. Code, § 3283), a jury may award damages for a plaintiff's loss of earning capacity only if the plaintiff is "reasonably certain to suffer a loss of future earnings." (*Robison*, *supra*, 211 Cal.App.2d at pp. 287-288; *Khan v. Southern Pacific Co.* (1955) 132 Cal.App.2d 410, 417-418 (*Khan*); accord, *Garcia v. Duro Dyne Corp.* (2007) 156 Cal.App.4th 92, 97 ["Courts have interpreted [Civil Code section 3283] to mean that a plaintiff may recover if the detriment is 'reasonably certain' to occur"].) Consistent with the classification of loss of earning capacity as general damages, the jury may infer the reasonable certainty of such a loss from the nature of the injury. (E.g., *Storrs*, *supra*, 134 Cal. at p. 94 ["It needs no evidence to show that a plaintiff in full health and vigor, who has lost an arm or a hand by reason of the negligence of the defendant, has had his earning power greatly impaired"]; *Lindemann v. San Joaquin Cotton Oil Co.* (1936) 5 Cal.2d 480, 494 (*Lindemann*) [same].) But a jury is not required to draw this inference, and damages for the loss of earning capacity may not be awarded

8

where the evidence demonstrates there was no such loss. (E.g., *Handelman v. Victor Equipment Co.* (1971) 21 Cal.App.3d 902, 905-909 [no loss of earning capacity for deep sea diver who has undertaken his deepest dives *after* his injury]; *Hallinan v. Prindle* (1936) 17 Cal.App.2d 656, 673 [no loss of earning capacity for "acute, but brief" pain at the time of an injection].)

### b.    Extent of damages for loss of earning capacity

The second question is a question of valuation. As its name suggests, a loss of earning capacity is the difference between what the plaintiff's earning capacity was *before* her injury and what it is *after* the injury. (Rest.2d Torts, § 924, com. d, p. 525 ["the difference, viewed as of the time of trial, between the value of the plaintiff's services as they will be in view of the harm and as they would have been had there been no harm"]; *Fein*, *supra*, 38 Cal.3d at p. 153, fn. 10 [adopting Restatement].) Because these damages turn on the plaintiff's earning *capacity*, the focus is "not [on] what the plaintiff *would* have earned in the future[,] but [on] what she *could* have earned." (*Hilliard*, *supra*, 148 Cal.App.3d at p. 412, italics added; *Gargir v. B'Nei Akiva* (1998) 66 Cal.App.4th 1269, 1281 (*Gargir*) [same]; *Storrs*, *supra*, 134 Cal. at p. 93 ["it is what [the plaintiff] was capable of earning, rather than what he was actually earning, that was to be considered by the jury"]; *Strosk v. Howard Terminal Co.* (1954) 129 Cal.App.2d 797, 799-800 [same]; *Rodriguez v. McDonnell Douglas Corp.* (1978) 87 Cal.App.3d 626, 656 (*Rodriguez*) ["'[one's] earning capacity is not a matter of actual earnings'"], overruled on other grounds in *Coito v. Superior Court* (2012) 54 Cal.4th 480, 499.) Consequently, proof of the plaintiff's prior earnings, while relevant to demonstrate earning capacity, is not a prerequisite to the award of these damages (e.g., *Neumann v. Bishop* (1976) 59 Cal.App.3d 451, 462 (*Neumann*) [no "proof of actual earnings or income either before or after the injury" required]; *Heiner v. Kmart Corp.* (2000) 84 Cal.App.4th 335, 348, fn. 6 (*Heiner*) [same]), nor a cap on the amount of those damages (e.g., *Robison*, *supra*, 211 Cal.App.2d at p. 287 [fact that plaintiff's actual earnings had not decreased prior to trial not a bar to loss of earning capacity damages]; *Paxton v. County of Alameda* (1953) 119 Cal.App.2d 393, 414-415 (*Paxton*) [same]).

9

Indeed, proof that the plaintiff had *any* prior earnings is not required because the "vicissitudes of life might call upon [the plaintiff] to make avail of her capacity to work," even if she had not done so previously. (*Gotsch v. Market S. Railway* (1928) 89 Cal.App. 477, 483.) Thus, damages for loss of earning capacity may be awarded to persons who, at the time of the injury, were homemakers (*Ibid.*; *Wilcox v. Sway* (1945) 69 Cal.App.2d 560, superseded on other grounds by Code Civ. Proc., § 634; *Davis v. Renton* (1931) 113 Cal.App. 561, 563-564), as well as persons who were retired or otherwise not working (*Storrs*, at p. 94-95 [75-year-old plaintiff serving in "positions of trust" in financial and other corporations]; *McCormack v. San Francisco* (1961) 193 Cal.App.2d 96, 98, 101-102 [71-year-old widow not working]; *Bencich v. Market S. R. Co.* (1938) 29 Cal.App.2d 641, 647-648 [retired plaintiff]).

A plaintiff's earning capacity without her injury is a function of two variables—the career(s) the plaintiff could have pursued and the salaries attendant to such career(s).

How is the jury to assess what career(s) are available to the plaintiff? Is the sky the limit? In other words, can a plaintiff urge the jury to peg her earning capacity to the salary of a world-class athlete, neuroscientist, or best-selling author just by testifying that is what she wanted to do? Or must the jury instead determine a plaintiff's earning capacity by reference to the career choices the plaintiff stood a realistic chance of accomplishing? We conclude some modicum of scrutiny by the trier of fact is warranted, and hold that the jury must look to the earning capacity of the career choices that the plaintiff had a reasonable probability of achieving.

We select this standard for five reasons.

First and foremost, the reasonable probability standard effectuates the standard our Supreme Court has long articulated. In *Zibbell*, the Court held that a plaintiff's pre-injury earning capacity was properly pegged to the "business, vocation, trade or profession" for which the "plaintiff had shown himself fitted and qualified" to undertake based on "the nature of his skill and experience." (*Zibbell*, *supra*, 160 Cal. at pp. 248-249; accord, *Neumann*, *supra*, 59 Cal.App.3d at p. 462; *Osterode v. Almquist* (1948) 89 Cal.App.2d 15, 19-20.) More generally, the Court in *Sargon Enterprises, Inc. v. University of*

10

*Southern California* (2012) 55 Cal.4th 747, 774-775 (*Sargon*) held that "[t]he law requires . . . that some reasonable basis of computation of damages be used." Where a plaintiff is not already "fitted and qualified" for the career she seeks to use to define her earning capacity, *Zibbell* and *Sargon* implicitly suggest that the plaintiff must demonstrate a reasonable probability that she would have become fit and qualified for that career. If she does, the jury will have a "reasonable basis of comput[ing]" what the plaintiff could have earned by looking to what persons in that career can earn.

Second, looking to the careers a plaintiff has a reasonable probability of achieving is consistent with the standard used to assess a business's prospective lost profits, which also looks to what profits are "reasonably probable." (*Nelson v. Reisner* (1958) 51 Cal.2d 161, 171-172; *Mammoth Lakes Land Acquisition, LLC v. Town of Mammoth Lakes* (2010) 191 Cal.App.4th 435, 470; *Wholesale Electricity Antitrust Cases I & II* (2007) 147 Cal.App.4th 1293, 1309-1310; see also *Sanchez-Corea v. Bank of America* (1985) 38 Cal.3d 892, 907 [looking to "'reasonable certainty'" as to extent of damages for lost profits]; accord, 29 Am.Jur.3d (2016) Proof of Facts, § 259 ["In a personal injury action, an injured plaintiff is entitled to claim damages for lost earning capacity, proximately caused by the injury, where such damages are established to a reasonable degree of probability and are not speculative"].) Although lost profits are awarded for breach of a contract while loss of earning capacity damages are awarded for a tort, both types of damages require the trier of fact to estimate the future earning capacity of a person or business; both exercises in estimation should turn on the same degree of certainty.

Third, using the reasonable certainty standard for assessing a plaintiff's *entitlement* to loss of earning capacity damages while using the less onerous reasonable probability standard for assessing the *extent* of those damages dovetails neatly with the venerable principle that "'[w]here the *fact* of damages is certain, the amount of damages need not be calculated with absolute certainty.'" (*Sargon*, *supra*, 55 Cal.4th at pp. 774-775, quoting *GHK Associates v. Mayer Group, Inc.* (1990) 224 Cal.App.3d 856, 873-874; *Small v. Fritz Companies, Inc.* (2003) 30 Cal.4th 167, 191; *JMR Construction Corp. v. Environmental Assessment & Remediation Management, Inc.* (2015) 243 Cal.App.4th

11

571, 585; accord, *Greenfield v. Insurance Inc.* (1971) 19 Cal.App.3d 803, 813 ["Once certainty as to the fact of damage is established, less certainty is required as to the amount of damage"].)

Fourth, requiring the plaintiff to prove that it is reasonably probable that she could have earned the salary she now claims is foreclosed by virtue of her injury ensures that the jury's fixing of damages is not wholly, and thus impermissibly, speculative. (*Ferguson*, *supra*, 30 Cal.4th at p. 1048 [noting "public policy against speculative damages"]; *Piscitelli v. Friedenberg* (2001) 87 Cal.App.4th 953, 989 ["it is fundamental that 'damages which are speculative, remote, imaginary, contingent, or merely possible cannot serve as a legal basis for recovery'"].) Use of this standard also ensures that the jurors, faced with a vacuum of evidence, do not commit misconduct by impermissibly resorting to their own extra-record knowledge in attempting to agree upon the likelihood that the plaintiff would become fit and qualified for a particular career. (E.g., *People v. Holloway* (1990) 50 Cal.3d 1098, 1108 [jurors may not rely on extra-record knowledge], overruled on other grounds in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1.)

Lastly, the reasonable probability standard harmonizes nearly all of the patchwork of cases that specify which careers a jury may look to in assessing a plaintiff's earning capacity. In cases where the plaintiff is already part of the work force, courts have looked to the plaintiff's earning capacity in his or her chosen career. (*Hicks v. Ocean Shore Railroad, Inc.* (1941) 18 Cal.2d 773, 784-785 (*Hicks*) [steam shovel operator]; *Torr v. United Railroads of San Francisco* (1921) 187 Cal. 505, 508-509 [teacher]; *Bonneau v. North S. R. Co.* (1907) 152 Cal. 406, 413-414 (*Bonneau*) [insurance solicitor]; *Neumann*, *supra*, 59 Cal.App.3d at p. 461 [employment with same employer]; *Khan*, *supra*, 132 Cal.App.2d at p. 418 [common laborer]; *Kraft v. Acme Stevedore Co.* (1931) 112 Cal.App. 653, 657-658 [stevedore]; *Washington v. Pacific E. R. Co.* (1910) 14 Cal.App. 685, 687-688 [physician].) In such instances, the fact that the plaintiff *was* fit and qualified for that career more than sufficed to show a reasonable probability that he could have been fit for that very same career in the future. Of course, the task of

12

determining a plaintiff's available career options is more difficult when the plaintiff is not yet in the work force. Where a very young plaintiff's catastrophic injury precludes any work, courts have fixed the lost earning capacity as the average salary of all workers in the workforce. (*Niles v. City of San Rafael* (1974) 42 Cal.App.3d 230, 241-242.) In that instance, it was reasonably probable that the plaintiff was fit and qualified to do *something* in the workforce, so the average salary of any and all workers was a reasonable measure. However, where a young plaintiff's injury prevents him or her from pursuing a specific career, courts have generally required some proof that the plaintiff is far along in his or her training or experience. Where she adduces such proof, courts have looked to that career's earnings to fix lost earning capacity. (E.g., *Connolly*, *supra*, 49 Cal.2d at pp. 488-489 [plaintiff was a "champion tennis player" who had won the National Singles Title three times, won the "four major championships of the world" and been offered a professional tennis tour; permissible to look to salary for professional tennis players]; *Ostertag v. Bethlehem Shipbuilding Corp.* (1944) 65 Cal.App.2d 795, 803-805 [apprentice electrician; permissible to look to salary for electricians]; *Rodriguez*, *supra*, 87 Cal.App.3d at pp. 656-659 [same, as to apprentice sprinkler fitter].) Where the plaintiff has not established her likely fitness for a particular career, courts have refused to look to that career in fixing earning capacity. (E.g., *Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 419 [plaintiff had less than "B" average in college and "unspectacular" test scores; impermissible to look to future earnings for doctors]; *Martinides v. Mayer* (1989) 208 Cal.App.3d 1185, 1205-1206 [plaintiff had "C" grades in high school, never attended college or any nursing classes; impermissible to look to future earnings for nurses].)

To be sure, a handful of cases suggest that a plaintiff's earning capacity is within a jury's common knowledge and thus may be left to the jury's judgment without the requirement of any evidence as to plaintiff's fitness for a particular career. (*Girard v. Irvine* (1929) 97 Cal.App. 377, 386; *Evarts v. Santa Barbara C. R. Co.* (1906) 3 Cal.App. 712, 715.) *Gargir* also seems to suggest that enrollment in college with a special education major with the intention to attend graduate school is enough by itself to

establish an earning capacity based upon a career in special education. (*Gargir*, *supra*, 66 Cal.App.4th at pp. 1280-1282.) Because *Girard*, *Evarts*, and *Gargir* are inconsistent with the weight of later Supreme Court precedent on this point and with the standard we derive from that precedent, we respectfully disagree with those decisions.

Once the jury has determined which career options are reasonably probable for the plaintiff to achieve, how is the jury to value the earning capacity of those careers? Precedent suggests three methods: (1) by the testimony of an expert witness (e.g., *Markley v. Beagle* (1967) 66 Cal.2d 951, 956; *Neumann*, *supra*, 59 Cal.App.3d at p. 461); (2) by the testimony of lay witnesses, including the plaintiff (e.g., *Storrs*, *supra*, 134 Cal. at pp. 94-95); or (3) by proof of the plaintiff's prior earnings in that same career (e.g., *Perry v. McLaughlin* (1931) 212 Cal. 1, 12; *Bonneau*, *supra*, 152 Cal. at pp. 413-414; *Ridley v. Grifall Trucking Co.* (1955) 136 Cal.App.2d 682, 688; *Tornell v. Munson* (1947) 80 Cal.App.2d 123, 125). As these options suggest, expert testimony is not always required. (E.g., *Paxton*, *supra*, 119 Cal.App.2d at p. 414; *Gargir*, *supra*, 66 Cal.App.4th at pp. 1280-1281; Evid. Code, § 801, subd. (a) [expert testimony must "[r]elate[] to a subject that is sufficiently beyond common experience"].) If an expert does testify, however, his or her testimony about the plaintiff's earning capacity must still be grounded in reasonable assumptions. (*Rodriguez*, *supra*, 87 Cal.App.3d at p. 659.) Some older Supreme Court decisions seem to suggest that the earning capacity of certain careers is within the jury's common knowledge without the need for further proof. (*Lindemann*, at pp. 494-495; *Storrs*, at p. 94.) In light of the vast array of diverse and disparate careers available today as well as the extensive case law setting forth the multiplicity of ways in which plaintiffs can and should prove the earnings associated with certain careers, we question whether these older cases are still viable. We have no occasion to reach this question because, as discussed below, plaintiff did not prove she was likely to become fit and qualified to be a lawyer.

Plaintiff offers three arguments in support of her position that the evidence she produced at trial—namely, her interest in a legal career and her letters of acceptance to

14

law school—supported the jury's $730,000 award for lost earning capacity and that no greater showing is required.

First, she contends that a loss of earning capacity may be inferred from the nature of the injury. As explained above, a jury may infer the *fact* of a loss of earning capacity. (See *Storrs*, *supra*, 134 Cal. at p. 94.) But the jury may not infer the *amount* or *extent* of that loss from the injury alone.

Second, plaintiff asserts that once she shows the fact of a loss of earning capacity, the burden shifts to the defendant to set an upper limit on her earning capacity and that the upper limit is not confined to the career plaintiff has chosen to pursue. As noted above, courts have drawn a distinction between the fact of an injury to a plaintiff's earning capacity on the one hand, and the extent of that injury on the other. (E.g., *Sargon*, *supra*, 55 Cal.4th at pp. 774-775.) That distinction lessens a plaintiff's burden to show the extent of damages once the fact of injury has been established, but it does not shift the burden to the defendant. Further, whether the inquiry into a plaintiff's earning capacity encompasses all careers for which a plaintiff shows her fitness to be reasonably probable or is instead limited to the subset of those careers that plaintiff desires to pursue is a difficult question. It is also one we need not resolve today in light of plaintiff's failure, discussed below, to adduce evidence on her fitness for *any* career.

Lastly, plaintiff argues that the case law does not require a plaintiff to adduce evidence quantifying any loss of earning capacity. For support, she cites *Connolly*, *supra*, 49 Cal.2d 483, *Hicks*, *supra*, 18 Cal.2d 773, *Heiner*, *supra*, 84 Cal.App.4th 335, and *Gargir*, *supra*, 66 Cal.App.4th 1269. *Connolly*, *Hicks*, and *Heiner* do not support plaintiff's argument because in each case the plaintiff introduced evidence of what persons in the plaintiff's chosen career earned. (*Connolly*, at pp. 488-489; *Hicks*, at p. 784; *Heiner*, at pp. 346-348.) And, as we explained above, *Gargir* is an outlier decision we decline to follow.

15

### B.     *Sufficiency of the evidence under this standard*

The trial court did not err in concluding that substantial evidence did not support the jury's award of $285,000 in past lost earnings and $730,000 in loss of earning capacity.

With respect to the loss of earnings prior to trial, the evidence indicated that, absent her injury, plaintiff would have started law school in the fall of 2013 and would still have been a law student by the time of trial in May 2015. Thus, there was no evidence of lost earnings prior to trial.

With respect to the prospective loss of earning capacity, plaintiff presented sufficient evidence that she was "reasonably certain" to suffer some loss of earning capacity due to the perpetual pain, bloating and dysfunction of her digestive tract caused by the negligently performed surgery. However, she did not introduce evidence establishing a reasonable probability that she could have become qualified and fitted to earn a lawyer's salary. Absent from the record is any evidence of her likelihood of graduating from Suffolk Law School, her likelihood of passing the Bar, or her likelihood of obtaining a job as a lawyer. Plaintiff also adduced no evidence as to what lawyers earn.

## III.    Remedy

Defendants argue that the trial court's finding that the jury's award of economic damages was unsupported by the evidence obligated the court to grant their motion for judgment notwithstanding the verdict and deny their new trial motion. Although we review the denial of a motion for judgment notwithstanding the verdict for substantial evidence (*Sweatman*, *supra*, 25 Cal.4th at p. 68) and the grant of a new trial for an abuse of discretion (*Oakland Raiders v. National Football League* (2007) 41 Cal.4th 624, 636), a trial court's selection of the appropriate remedy in this case turns on a question of statutory construction; as such, it is a question of law we review de novo. (*John v. Superior Court* (2016) 63 Cal.4th 91, 95-96.)

16

A party faced with an adverse result may move for judgment notwithstanding the verdict when, among other things, the "verdict" is "not supported by the facts." (Code Civ. Proc., § 663; *Kelly v. Haag* (2006) 145 Cal.App.4th 910, 919.) What is more, when the facts are insufficient and "[w]hen the [nonmoving party] has had full and fair opportunity to present [her] case, . . . a judgment for [the moving party] is required and no new trial is ordinarily allowed." (*McCoy v. Hearst Corp.* (1991) 227 Cal.App.3d 1657, 1661 (*McCoy*); *Kelly*, at p. 919; *Kim v. Westmoore Partners, Inc.* (2011) 201 Cal.App.4th 267, 289 (*Kim*); *Viner v. Sweet* (2004) 117 Cal.App.4th 1218, 1232.)

This general rule is grounded in two rationales. The first is judicial economy and, in particular, the recognition that a trial "is not a practice run to be scrapped in favor of a more complete proceeding in the event of an adverse judgment." (*Garretson v. Harold I. Miller* (2002) 99 Cal.App.4th 563, 575.) If the plaintiff did not adduce sufficient evidence in the first trial, the logic goes, why should she be given a second bite at the apple? The second rationale is procedural symmetry: If a trial court grants a nonsuit or directed verdict due to insufficient evidence, the remedy is entry of judgment for the moving party, not a new trial; why should the remedy be any different when the finding of insufficient evidence is made in a posttrial motion for judgment notwithstanding the verdict? (See *McCoy*, *supra*, 227 Cal.App.3d at p. 1661.)

We reject defendants' suggestion that this general rule is without exception, and we do so for several reasons. To begin, the statute that confers upon trial courts the power to grant a new trial specifically authorizes—and thus specifically contemplates—a new trial due to "[i]nsufficiency of the evidence to justify the verdict" or due to "[e]xcessive . . . damages." (Code Civ. Proc., § 657.) A trial court evaluating a new trial motion on these grounds sits "as a thirteenth juror," asking whether "the weight of the evidence appears to be contrary to the jury's determination"; in so doing, the court is free to "'disbelieve witnesses, reweigh the evidence, and draw reasonable inferences therefrom contrary to those of the trier of fact.'" (*Barrese v. Murray* (2011) 198 Cal.App.4th 494, 503, quoting *Mercer v. Perez* (1968) 68 Cal.2d 104, 112.) Because, as noted above, a trial court evaluating a motion for judgment notwithstanding

17

the verdict may not independently assess the evidence, trial courts have greater latitude to grant a new trial than to grant judgment notwithstanding the verdict. However, a verdict that is "against the weight of the evidence" necessarily includes a verdict not supported by any evidence; consequently, defendants' proposed rule that a new trial may not be granted whenever a judgment notwithstanding the verdict could be granted would curtail to some extent a trial court's freedom to grant a new trial. To avoid this result, courts have recognized that the general rule favoring entry of judgment will give way to a court's discretion to grant a new trial in cases (1) where newly discovered evidence may be introduced at the new trial (*Cardinal Health 301, Inc. v. Tyco Electronics Corp.* (2008) 169 Cal.App.4th 116, 153; *Kim*, *supra*, 201 Cal.App.4th 267 at p. 289), or, more generally, (2) where a retrial would serve some further purpose beyond giving the nonmoving party a second opportunity to try her case (*Cardinal Health*, at p. 153).

We conclude that the trial court did not err in ruling that this case is excepted from the general rule mandating entry of judgment, and that the trial court did not abuse its discretion in granting a new trial. Two reasons support this conclusion. First, as the trial court remarked, the jury's woefully inadequate award for pain and suffering damages and its wholly unsupported award for economic damages suggest the possibility that the jury may have incorrectly filled in the blanks for damages on the special verdict form. If that is the case, allowing plaintiff the opportunity to fix one half of the prior jury's mistake (by obtaining a larger damages award for pain and suffering in a retrial) while denying her the opportunity to fix the other half (by obtaining any damages for economic loss) would be unfair. Second, the trial court did not rule on plaintiff's request for judicial notice of the Bureau's median salary for lawyers until the close of evidence. Although the court gave the issue thoughtful consideration, the end result is that plaintiff did not have a definitive ruling until it was too late to marshal other evidence on this point (and too late to allow defendants to marshal contrary evidence). Although plaintiff certainly could have taken the "belt and suspenders" approach and introduced other evidence at the outset, we think the lateness of the court's ruling along with the jury's possible confusion in awarding damages make it fair for the court to have granted plaintiff a second

18

opportunity to prove all of her damages. This interest in fairness takes the unusual circumstances of this case outside of the general rule mandating entry of judgment and places the trial court's grant of a new trial within its discretion.

## IV. Evidentiary Issues on Retrial

Plaintiff raises two evidentiary issues sure to arise during the damages retrial.[2] In the interest of judicial economy, we address them now.

### A. Judicial notice

Plaintiff argues that the trial court is obligated as a matter of law to take judicial notice of the Bureau's report indicating that the median salary for lawyers in 2012 was $113,530, and that the trial court has no discretion to exclude that evidence.

A court may take judicial notice of, among other things, the "[o]fficial acts of the legislative, executive, and judicial departments of the United States . . ." and "[f]acts and propositions that are not reasonably subject to dispute and are capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy." (Evid. Code, § 452, subds. (c) & (h).) What is more, the court's discretion to take judicial notice of these matters disappears—and the court becomes *obligated* to judicially notice these matters—if the moving party gives adequate advance notice. (Evid. Code, § 453.) Because judicially noticed matters are a "substitute for proof," the trial court retains its usual discretion not to take judicial notice of matters that are irrelevant or, under Evidence Code section 352, have a probative value that is substantially outweighed by the probability that their admission will create a substantial danger of undue prejudice, confusing the issues, or misleading the jury. (*Mangini v. R. J. Reynolds Tobacco Co.*

---

2      Plaintiff also invites us to direct the trial court on retrial to instruct the jury that her loss of earning capacity can be inferred from the nature of her injury, that earning capacity turns on what a plaintiff "could" have earned, and that she need not present expert testimony on earning capacity. We decline plaintiff's invitation. Our opinion sets forth the guiding legal principles, and we will not hamstring the trial court by telling it in advance which instructions to give, particularly when those instructions may depend upon the evidence introduced during the retrial, which we cannot anticipate at this time.

(1994) 7 Cal.4th 1057, 1063 (*Mangini*), overruled on other grounds in *In re Tobacco Cases II* (2007) 41 Cal.4th 1257, 1276.)

We conclude that the trial court is not obligated to take judicial notice of the fact that the average median salary of lawyers in 2012 was $113,530 for several reasons. This fact is not necessarily subject to judicial notice as an "[o]fficial act." (Evid. Code, § 452, subd. (c).) Although the Bureau's report is an official act of a federal executive agency, this ground for taking judicial notice extends to the official act itself (that is, the fact that the Bureau has published a report on attorney salaries), but not the truth of the facts relayed through that official act (that is, the fact that median salary was $113,530). (*In re Joseph H.* (2015) 237 Cal.App.4th 517, 541-542 ["we can take judicial notice of official acts and public records, but we cannot take judicial notice of the truth of the matters stated therein"]; *Horne v. District Council 16 Internat. Union of Painters & Allied Trades* (2015) 234 Cal.App.4th 524, 535; *Mangini*, *supra*, 7 Cal.4th at pp. 1063-1064.) This fact is also not necessarily subject to judicial notice as a fact "not reasonably subject to dispute" because the attorney salary figure set forth in the report is not "capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy." (Evid. Code, § 452, subd. (h).) The report does not cite any further source for the salary figure, and the report cannot verify its own accuracy. Nor is the median salary subject to judicial notice, as plaintiff argued below, just because she gave notice to defendants of her request. The plain language of Evidence Code section 453 makes clear that judicial notice becomes mandatory only if the matter to be noticed fits within one of the categories set forth in section 452. (Evid. Code, § 453 ["The trial court shall take notice of any matter *specified in Section 452*"], italics added.) This is not to say that an expert could not rely upon the Bureau's report in forming an opinion (Evid. Code, § 801, subd. (b)), but the report's factual findings are not themselves subject to mandatory judicial notice.

Plaintiff resists this conclusion, citing several cases she insists allow for judicial notice of facts contained in reports of government agencies. Plaintiff cites *Kilker v. Stillman* (2015) 233 Cal.App.4th 320, 328, but the court in that case refused to take

judicial notice of material irrelevant to the case before it.  Plaintiff also cites *Lorraine v. Markel American Ins. Co.* (D.Md. 2007) 241 F.R.D. 534, 551, but that case did not involve judicial notice at all.  Plaintiff points us to *Rizo v. Yovino* (E.D.Cal. Dec. 4, 2015, No. 1:14-cv-0423-MJS) 2015 U.S.Dist. Lexis 163849, where the court took judicial notice of a Bureau report, but that court did so in part on the basis of rule 902 of the Federal Rules of Evidence, which does not apply here.  (*Id.* at pp. 12-13.)  Plaintiff is correct that the court in *In re Israel O.* (2015) 233 Cal.App.4th 279, 289, footnote 8, took judicial notice of the content of official documents setting forth how federal agencies were interpreting a federal statute, and *Sanchez v. City of Modesto* (2006) 145 Cal.App.4th 660, 666, footnote 1, took judicial notice of the racial composition of California residents found in a federal Census Bureau website.  But *In re Israel O.* judicially noticed the actions of the federal agencies as reflected by their opinions rather than the facts contained in those opinions, and *Sanchez* cited the Census Bureau statistics as an aside and without any analysis of whether doing so was appropriate under our judicial notice statutes.  These cases do not dictate a different analysis from the one we have set forth above.

## B.     *Information specific to plaintiff's chosen law school*

Plaintiff also argues that the trial court must exclude evidence regarding the graduation rates, Bar passage rates and employment statistics of students of the Suffolk Law School.  She claims that school-specific information is per se inadmissible under *Hinson v. Clairemont Community Hospital* (1990) 218 Cal.App.3d 1110, superseded on other grounds by Evidence Code section 1157.  *Hinson* held that the poor reputation of a medical school was inadmissible, as improper character evidence, when admitted to show that the defendant—a graduate of that school—committed malpractice against the plaintiff.  (*Id.* at p. 1122.)  *Hinson* does not speak to the admissibility of school-specific information when it is introduced for other purposes, such as to show whether there is a reasonable probability that a plaintiff attending that school will graduate, pass the Bar or become gainfully employed as a lawyer.  If the evidence introduced during the retrial supports a link between a law school and the earning capacity of its graduates, then it is

up to the trial court to assess whether the evidence should be admitted.  The limitations on character evidence set forth in *Hinson*, however, do not erect an absolute bar to admissibility.

## DISPOSITION

The judgment is affirmed.  Each party is to bear its own costs.

## <u>CERTIFIED FOR PUBLICATION.</u>

_____, J.
HOFFSTADT

We concur:

_____, P. J.
BOREN

_____, J.
CHAVEZ