Filed 6/20/24 (unmodified opn. attached)

# CERTIFIED FOR PARTIAL PUBLICATION*

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# SECOND APPELLATE DISTRICT

# DIVISION TWO

| | |
|---|---|
| CAROLINA BEVERAGE CORPORATION et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> FIJI WATER COMPANY, LLC, <br><br> Defendant and Appellant. | B324609, consolidated with B325931 and B326861 <br><br> (Los Angeles County Super. Ct. No. 19STCV32342) <br><br> ORDER MODIFYING OPINION AND DENYING REHEARING <br><br> NO CHANGE IN THE JUDGMENT |

---

\* Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication as to all parts except Parts II and III of the Discussion.

THE COURT:

It is ordered that the opinion filed herein on May 30, 2024, be modified as follows:

1. On page 24, after the paragraph ending "(JRS Products, Inc. v. Matsushita Electric Corp. of America (2004) 115 Cal.App.4th 168, 182.)" add the following two paragraphs (including footnote 13):

> In its petition for rehearing, Carolina Beverage takes issue with our analysis of this second point, arguing that (1) we cannot reverse the jury's verdict based on errors with the implied covenant instruction because (a) such error was not in the parties' briefing on appeal, (b) FIJI invited the instructional error, and (c) the proper remedy for an incorrect jury instruction is a retrial with the correct instruction (rather than entry of a different judgment); (2) we cannot look to any law outside the jury instructions in assessing whether the implied covenant instruction was correct; and (3) our holding is inconsistent with *R. J. Kuhl Corp. v. Sullivan* (1993) 13 Cal.App.4th 1589 (*Sullivan*).[13]

---

[13] Carolina Beverage also argues that our citation to authority that a party's motive is irrelevant to a breach of contract claim is incorrect because motive can be relevant to a breach of implied covenant claim. Because we did not say that motive is irrelevant to a breach of implied covenant claim, Carolina Beverage's criticism is misplaced.

2

These arguments rest on a misreading of our analysis, a misreading of the law, or both. Carolina Beverage's first cluster of arguments ignores that our concern with the implied covenant instruction is not with the language of the instruction but with the fact that it rests on a theory of constructive termination we have held is invalid under the law as well as the undisputed facts of this case. Whether constructive termination is a valid theory was thoroughly (and, indeed, exhaustively) litigated in the trial court and on appeal, so there is no invited error or issue not briefed. What is more, because Carolina Beverage's operative theory for recovery under its implied covenant claim is legally invalid, the proper remedy is judgment for FIJI. Carolina Beverage's second argument that we may not look beyond the jury instructions themselves to determine whether a claim rests on a legally invalid theory is not the law, for that would mean that any time a party convinced a trial court to send the case to a jury on an invalid theory, that theory would be immune from appellate review; none of the cases Carolina Beverage cites are to the contrary. And Carolina Beverage's reliance on *Sullivan* is misplaced, for that case held that a real estate agent was entitled to his commission, despite not consummating a sale, because the law says agents earn their commission once their client enters into a binding contract and because the contract in that case did not "provide[] otherwise." (*Sullivan, supra,* 13 Cal.App.4th at p. 1600.) Here, as noted above, the parties' distribution agreement

3

explicitly granted FIJI the right to invade Carolina Beverage's territory upon paying an invasion fee (and not a termination fee).  Our decision is consistent with *Sullivan*.

\*      \*      \*

There is no change in the judgment.

The petition for rehearing is denied.

_____

ASHMANN-GERST, Acting P. J.  CHAVEZ, J.  HOFFSTADT, J.

4

Filed 5/30/24 (unmodified opinion)

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| CAROLINA BEVERAGE CORPORATION et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> FIJI WATER COMPANY, LLC, <br><br> Defendant and Appellant. | B324609, consolidated with B325931 and B326861 <br><br> (Los Angeles County Super. Ct. No. 19STCV32342) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Maurice A. Leiter, Judge. Reversed in part, vacated in part, and remanded with instructions.

---

* Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication as to all parts except Parts II and III of the Discussion.

Womble Bond Dickinson, Kristin Walker-Probst, David A. Berkley, Ronald R. Davis; Severson & Werson and Jan T. Chilton for Plaintiffs and Appellants.

Horvitz & Levy, Steven S. Fleischman, and Emily V. Cuatto; Roll Law Group, Courtney E. Vaudreuil and Matthew D. Moran for Defendant and Appellant.

\* \* \* \* \* \*

A manufacturer entered into a contract with a third-party distributor granting the distributor an "exclusive" right to distribute the manufacturer's product to retailers within the distributor's geographic territory. That right was a qualified one, because the agreement (1) granted the manufacturer the right to *invade* the distributor's territory by selling and delivering its product directly to retailers in that territory as long as it paid the distributor an "invasion fee," and (2) granted the manufacturer the right to terminate the contract "for any reason in its sole discretion" upon giving written notice as long as it paid the distributor a higher "termination payment." The manufacturer ended up invading around 85 percent of the distributor's territory but never invoked its right to terminate under the contract. The distributor sued and went to trial on two contract-related claims on the theory that the manufacturer had *constructively* terminated the contract, and a jury awarded the distributor the amount of the "termination payment" set forth in the contract. This case therefore presents the question: Is "constructive termination" of a distribution contract a viable theory of recovery under California common law? We hold that it is not. We also

hold that it is not a theory contemplated by the contract in this case. And we hold that the contract here was not constructively terminated because the distributor continued to operate under the contract, and thus did not satisfy one of the prerequisites of constructive termination. We accordingly conclude that the trial court erred in allowing the constructive termination theory to go to the jury. The jury verdict on the contract-related claims must therefore be reversed and judgment entered for the manufacturer. In the unpublished portion of this opinion, we reject the distributor's challenges to two evidentiary rulings pertinent to a related tort claim the jury rejected. We vacate the trial court's award of attorney fees for the distributor, as it is no longer the prevailing party, and remand for further proceedings regarding attorney fees.

## FACTS AND PROCEDURAL BACKGROUND

### I. Facts

#### A. *The parties and their distribution agreement*

FIJI Water Company, LLC (FIJI), manufacturers premium bottled water from a source on the island of Viti Levu in the South Pacific. It is one of the top manufacturers of premium water in the United States.

Prior to 2018, FIJI distributed its products to retailers chiefly through third-party distributors. Those distributors would act as intermediaries between FIJI and the retailers within specific geographic territories, and provided retailers support and services (such as checking inventory and monitoring displays of the product in the retailers' stores) in exchange for a slightly higher product price. However, some retailers declined to work with third-party distributors and instead purchased FIJI's product directly from FIJI.

On January 2, 2009, FIJI entered into a five-year distribution agreement with Carolina Beverage Corporation (Carolina Beverage),[2] a well-established beverage distributor in business since 1913, for distribution of its products in parts of North Carolina, South Carolina, and Georgia.[3] In pertinent part, the agreement:

- Granted Carolina Beverage "the exclusive right to distribute" FIJI's products within the designated territory.[4]

- Nevertheless granted FIJI the right to directly sell and deliver to retailers within Carolina Beverage's territory who are "national account customers" or "[n]ational [a]ccount's outlets." This right to invade Carolina Beverage's territory was qualified: Before FIJI could invade, it was required to "discuss" and "endeavor to negotiate terms on which [FIJI and Carolina Beverage] can participate" in those sales; should the parties be unable to agree, however, FIJI could invade by paying Carolina

---

[2] Carolina Beverage owns Carolina Bottling Company, Quality Beverage, LLC, Piedmont Cheerwine Beverage Corporation, Dixie Riverside, Inc., and Alligator Beverage, LLC; it is the owned entities that did the distributing. However, Dixie Riverside and Alligator Beverage settled, and the remaining entities all assigned their claims at issue in this case to Carolina Beverage. For the sake of simplicity, we will collectively refer to all the entities as Carolina Beverage.

[3] Between 2001 and 2008, Carolina Beverage acted as a third-party distributor for FIJI under an oral "handshake deal."

[4] This right excluded distribution to "On Premise accounts," "retail accounts" that did not accept deliveries from third-party distributors, and other enumerated "[e]xcluded [a]ccounts."

8

Beverage an "invasion fee" of $1 per each case of products FIJI sold and delivered directly.[5]

● Granted FIJI and Carolina Beverage certain rights to terminate the agreement. Specifically:

− Both FIJI and Carolina Beverage had a right to terminate the agreement, "immediately [and] without penalty," "upon a material breach by the other party of its obligations, duties, representations or warranties," if the non-breaching party gave notice of the breach and a 30-day opportunity for the breaching party to cure the breach.

− FIJI had a right to "immediately terminate th[e] [a]greement without penalty" for any one of eight enumerated reasons (such as Carolina Beverage's failure to pay for inventory or its bankruptcy, to name a few).

− Carolina Beverage had a right to terminate the agreement "for any reason" upon 180 days' notice. Once exercised, FIJI had the right to "immediately" and "without penalty" terminate the agreement.

− FIJI had a right to terminate the agreement "at any time and for any reason in its sole discretion upon" 30 days' written notice. But if FIJI exercised this right, it would be liable for a "termination payment" of $5 per case of products Carolina Beverage sold during the prior calendar year. The agreement explicitly provided that "[n]othing in th[e] [a]greement shall be

---

[5] FIJI also retained a right to directly *sell* products to "national account customers" and their "[l]ocal [o]utlets" "on behalf of [Carolina Beverage] and for [Carolina Beverage's] account," as long as Carolina Beverage continued to deliver the products. In this situation, FIJI would owe no invasion fee.

9

construed to require FIJI to pay the Termination Payment in any other event."

●      Provided that FIJI "shall not be liable" for "special, indirect, consequential or punitive damages, lost profits or lost business" under "any contract, negligence, strict liability or other legal or equitable theory."

●      Granted the "prevailing party" on any action "to enforce and/or interpret the terms" of the agreement "its reasonable attorneys' fees and costs."

The agreement had a five-year term subject to five-year renewal terms.  The parties renewed the agreement in 2014, with an expiration date of January 2, 2019.

### B.      *FIJI shifts from third-party distribution to a direct distribution model*

Upon learning in early 2018 that the third-party distributor that handled 65 percent of its product in the United States had changed hands and being unsure what that meant for its distribution network, FIJI studied and, in June 2018, ultimately decided to transition to a direct distribution model and to phase out its use of other third-party distributors.[6]  FIJI was not immediately forthright with its distributors about its intentions, publicly proclaiming in July 2018 that FIJI would "continue to work with many of its other trusted distribution partners."  When Carolina Beverage—which by 2018 distributed approximately 3 percent of FIJI's product in the United States—contacted FIJI about this proclamation, FIJI inaccurately assured Carolina Beverage that it would be "business as usual."

---

[6]      FIJI's internal investigation was known as "Project Sunny."

**C.   *FIJI invades Carolina Beverage's territory***

Notwithstanding its assurances, FIJI began to invade Carolina Beverage's territory by negotiating direct distribution agreements with retailers within that territory. Through the fall of 2018, more and more of Carolina Beverage's retailers switched to direct distribution with FIJI. By November 2018, FIJI had invaded around 85 percent of Carolina Beverage's retailers.

As this was happening, the parties communicated. During a September 10, 2018 call, FIJI provided a list of retailers within Carolina Beverage's territory that would be switching to direct distribution, but assured Carolina Beverage that it was not being terminated and reaffirmed that it would be "business as usual." When Carolina Beverage subsequently learned that another large retailer within its territory would soon be switching to direct distribution from FIJI, Carolina Beverage sent a letter on September 24, 2018 in which it (1) declared FIJI in breach of the "exclusivity" provisions of the agreement, (2) demanded payment of the "invasion fee," and (3) demanded payment of the "termination payment" of $1,972,375 under the agreement on the theory that FIJI's invasion had "constructive[ly] terminat[ed]" the agreement. In letters dated October 16, 2018 and November 6, 2018, FIJI responded that it was *not* terminating the agreement and offered to pay the invasion fee provided for in the agreement, recognizing that it had not attempted to first include Carolina Beverage in negotiations over the transition to direct distribution. Carolina Beverage declined FIJI's offers of the invasion fee.

Throughout this period of time, Carolina Beverage continued to perform under the agreement and to distribute FIJI's products to Carolina Beverage's remaining retailers.

11

Indeed, it continued to purchase inventory from FIJI in December 2018.

### D. *The agreement expires*

On November 19, 2018, FIJI formally gave notice of its intent not to renew the agreement after the January 2, 2019 expiration date.

## II. Procedural Background

### A. *The complaint*

Carolina Beverage sued FIJI in September 2019.[7] In the operative first amended complaint, Carolina Beverage alleged claims for (1) breach of contract, based on FIJI (a) failing to negotiate before invading Carolina Beverage's territory, and (b) "constructively terminat[ing]" the agreement; (2) breach of the implied covenant of good faith and fair dealing, based on FIJI "unfairly interfer[ing]" with the "right to receive the benefits of the" agreement by invading Carolina Beverage's territory "to steal [its] customers" while "misrepresenting its stated intent to continue to use Carolina Beverage"; and (3) concealment, based on FIJI's failure to disclose its intent to fully invade its territory, which thereby prevented Carolina Beverage from pursuing the opportunity to become a third-party distributor for FIJI's main competitor.[8]

---

[7] The agreement contains a provision setting California as the governing law and requiring any actions to be filed in the Los Angeles County Superior Court.

[8] Carolina Beverage also alleged a cause of action for false promise, but the jury rejected that claim and Carolina Beverage does not challenge that verdict on appeal. Thus, we do not discuss the claim further.

**B.** *FIJI opposes Carolina Beverage's constructive termination theory*

In both a motion for summary judgment and a motion in limine to exclude evidence, FIJI argued that "constructive termination" was not a viable theory of liability under California common law. The trial court denied both motions.

**C.** *Trial*

The matter proceeded to a 10-day jury trial in April 2022.

According to FIJI, FIJI's invasion of Carolina Beverage's territory was authorized by the agreement because the retailers with whom it directly delivered were almost all national accounts (as permitted by the agreement). However, FIJI acknowledged that it had failed to first negotiate with Carolina Beverage regarding the terms of the invasion as required by the agreement, although FIJI urged that those negotiations would not have averted the invasion because FIJI *had* to invade once most of the retailers decided to switch to direct distribution. FIJI did not dispute that it owed an invasion fee of $55,367.

According to Carolina Beverage, FIJI had no right to invade its territory because almost none of the retailers with whom FIJI directly delivered were national accounts, which Carolina Beverage contended meant only retailers present in all 50 states. Based on testimony that "industry standards" prohibited manufacturers from "just com[ing] in and steal[ing] your business out from under you," Carolina Beverage urged that FIJI's extensive and unauthorized invasion of its territory constituted a "constructive termination" of the agreement. Rather than seek its lost profits due to that invasion (which ranged from $202,000 to $230,069) or the invasion fee (of $55,367), Carolina Beverage argued that it was entitled to the

13

termination payment under the agreement, which came to $1,993,670.

At the close of evidence, FIJI moved for a directed verdict on the ground that constructive termination was not a viable theory. The trial court denied the motion.

The court gave the following jury instruction on the constructive termination theory:

> "A party can constructively terminate a contract through its conduct. Constructive termination occurs when one party unilaterally modifies the terms of the contractual relationship in a way that substantially interferes with the other party's ability to obtain the benefits of the contract, and the relationship between the parties ends. [¶] Constructive termination does not require express notice that the contract is being terminated."

The special verdict form submitted to the jury specified that the *only* measure of damages Carolina Beverage sought was the termination payment.

The jury returned a verdict for Carolina Beverage on its claims for breach of contract and breach of the implied covenant, and awarded as damages the termination payment of $1,993,670. The jury rejected Carolina Beverage's concealment claim after specially finding that FIJI's concealment was not a substantial factor in causing Carolina Beverage harm.

14

**D.** *FIJI's motion for judgment notwithstanding the verdict (JNOV)*

Before judgment was entered, FIJI moved for JNOV on the ground that the verdict based constructive termination was invalid because, even if it was a legally viable theory, it required proof that Carolina Beverage had ceased operating under the agreement, yet the undisputed evidence at trial indicated Carolina Beverage had continued to operate under the agreement. Following further briefing and a hearing, the trial court denied the JNOV motion. The court reasoned that "[t]he jury was persuaded" that FIJI's "conduct" of "siphon[ing] almost 90% of [Carolina Beverage's] sales volume before expiration of the contract" "breached the agreement and effectively terminated it."

**E.** *Carolina Beverage's attorney fees*

After the trial court determined that Carolina Beverage was the prevailing party for purposes of the attorney fees clause in the agreement, the parties litigated the amount of fees that should be awarded. Carolina Beverage sought $4,388,902 in fees. FIJI urged that the appropriate amount was no more than $1,227,845 given the frequency of block billing entries that included work on the unsuccessful concealment claim. After further briefing and a hearing, the trial court issued an order on October 20, 2022 awarding Carolina Beverage $4,343,712 (that is, reducing the fees by $45,190).[9]

---

[9]    Carolina Beverage also requested $842,265.97 in costs, which the trial court significantly reduced given the "'spaghetti at the wall' approach" of the request. Carolina Beverage does not challenge that ruling on appeal.

**F.    *Appeals***

Following the entry of judgment, FIJI and Carolina Beverage both timely appealed.[10]

## DISCUSSION

This appeal presents three issues.  First, FIJI argues that the trial court erred in denying its JNOV motion because constructive termination is not a viable theory for contract-based recovery either as a matter of law or as a matter of undisputed fact.  Second, Carolina Beverage argues that the trial court erred in two evidentiary rulings that necessitates a new trial on the concealment claim the jury rejected.  Third, FIJI argues that the trial court abused its discretion in awarding over $4 million in attorney fees because that sum included fees incurred by Carolina Beverage in litigating its unsuccessful concealment claim.  We review the first issue de novo (*Hirst v. City of Oceanside* (2015) 236 Cal.App.4th 774, 782), and the last two issues for an abuse of discretion (*People v. Flores* (2020) 9 Cal.5th 371, 409 [evidentiary rulings]; *Gutierrez v. Chopard USA Ltd.* (2022) 82 Cal.App.5th 383, 392-393 [amount of attorney fees]).

## I.    Constructive Termination (Denial of the JNOV Motion)

As a threshold matter, it is undisputed that FIJI did not owe Carolina Beverage the termination payment by virtue of *actually* terminating the agreement—that is, by terminating the agreement under the terms of the agreement itself:  Section 3(a)

---

[10]    FIJI filed a second motion for JNOV after judgment was entered.  The trial court took "no action" on that motion because it had ruled on the first motion and because FIJI "already . . . appealed that ruling."  FIJI filed a second notice of appeal from that order, and we consolidated the two appeals.

of the agreement explicitly provides that "[n]othing in th[e] [a]greement shall be construed to require FIJI to pay the Termination Payment" except when FIJI terminates the agreement pursuant to section 2(e)(ii); section 2(e)(ii) of the agreement applies when FIJI "terminate[s] th[e] [a]greement . . . upon thirty (30) days written notice"; and FIJI never sent a written notice terminating the agreement (and, to the contrary, explicitly and repeatedly reaffirmed that it was *not* terminating the agreement).  Thus, the sole basis for the jury's award of the termination payment as damages on Carolina Beverage's contract-related claims is that FIJI *constructively* terminated the agreement.  Indeed, the jury was specifically instructed that "constructive termination" occurs whenever one party to a contract "interferes with the other party's ability to obtain the benefits of the contract."  We must therefore ask:  Was constructive termination a viable theory for recovery in this case?  We hold that it was not for three reasons.

**A.** ***Constructive termination of non-employment and non-tenancy contracts is not a viable theory under California common law***

We hold that the general rule under California common law is that a party may not seek contractual recovery on the basis of constructive termination, and this is a question of law we independently examine. (*Kaanaana v. Barrett Business Services, Inc.* (2021) 11 Cal.5th 158, 165.)

This holding flows inexorably from the core tenets of California contract law that parties to a contract—and especially sophisticated parties who enter into commercial contracts—are empowered to define for themselves and through the contract's terms the rules that will govern their relationship (*Erlich v.*

17

*Menezes* (1999) 21 Cal.4th 543, 558 [parties to a contract ""agree upon the rules and regulations which will govern their relationship [and] create a mini-universe for themselves""]), and that the California courts will enforce—rather than alter—those terms (*Rosen v. State Farm General Ins. Co.* (2003) 30 Cal.4th 1070, 1078; *Boyer v. United States Fidelity & Guaranty Co.* (1929) 206 Cal. 273, 276-277).  Thus, if a contract does not itself recognize the concept of constructive termination, the courts may not graft that concept onto that contract.

　　To be sure, this general rule has two exceptions in which the California courts have engrafted onto contracts a constructive termination provision—namely, (1) employment contracts, where an employer may "constructively discharge[]" an employee (*Mullins v. Rockwell International Corp.* (1997) 15 Cal.4th 731, 737-739 (*Mullins*); *Turner v. Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1249, 1251 (*Turner*));[11] and (2) lease contracts, where a landlord may "constructively evict" a tenant (*Green v. Superior Court* (1974) 10 Cal.3d 616, 625, fn. 10; *Ginsberg v. Gamson* (2012) 205 Cal.App.4th 873, 897-899).  But these exceptions exist for very specific *policy* reasons—chiefly, to give the economically weaker party (the employee and the tenant) a means of severing what has become an intolerable relationship to

_____

11　　The doctrine of constructive discharge also applies to at-will employment, where the terms of employment are supplied by the common law rather than a contract between the parties. Indeed, to be actionable, the termination of an at-will employment contract—whether the termination is actual or constructive—must also contravene fundamental public policy as expressed in a constitutional or statutory provision. (*Turner*, *supra*, 7 Cal.4th at p. 1252; *Jennings v. Marralle* (1994) 8 Cal.4th 121, 129-130.)

protect that party from further abuse under the contract. (*Dynamex Operations West, Inc. v. Superior Court* (2018) 4 Cal.5th 903, 960; *Green*, at p. 625; see generally *Gutierrez v. Autowest, Inc.* (2003) 114 Cal.App.4th 77, 94-95 ["California courts refuse to uphold contractual terms" that "violate[] . . . public policy"].)  Those policy justifications for rewriting a contract to add a constructive termination provision do not exist in other contexts, and hence the California courts have declined to add such a provision in any other type of contract.  We also decline to do so.

Carolina Beverage asserted in the trial court that at least one court purporting to apply California common law denied summary judgment on the ground that constructive termination of contracts generally is a viable theory.  The case is *KST Data, Inc. v. Northrop Grumman Systems Corp.* (C.D.Cal. Apr. 17, 2019, No. CV 17-5125-MWF (PJWx)) 2019 U.S. Dist. Lexis 113419.  *KST* does appear to rule, implicitly at least, that constructive termination is a viable theory in all contract actions. Of course, *KST* is an unpublished federal district court decision, which is, at best, persuasive authority and only if we find it persuasive.  (*Rohr Aircraft Corp. v. County of San Diego* (1959) 51 Cal.2d 759, 764, revd. on other grounds (1960) 362 U.S. 628; *LG Chem, Ltd. v. Superior Court* (2022) 80 Cal.App.5th 348, 371.) But we do not, because it makes no effort to square its ruling with the whole of California law to the contrary.

**B.**     ***The agreement in this case did not contain a constructive termination provision***

Alternatively, the agreement *in this case* unambiguously does not contain a constructive termination provision, and the interpretation of the unambiguous text of a contract presents a

question of law we independently undertake. (*Abifadel v. Cigna Ins. Co.* (1992) 8 Cal.App.4th 145, 159; *Brown v. Goldstein* (2019) 34 Cal.App.5th 418, 433.)

The agreement contains four different ways in which it may be terminated, and none of them is based on constructive termination of the agreement through a substantial breach of its provisions. Not only does the agreement fail to declare a substantial breach to be a constructive termination, the agreement's invasion clause *specifically authorizes* FIJI to breach the agreement under certain circumstances and places no cap on how much of Carolina Beverage's territory may be invaded. Thus, the agreement does not allow for its constructive termination.

Carolina Beverage resists this conclusion with what boils down to two arguments.

First, Carolina Beverage argues that the agreement is ambiguous because the term "termination" is undefined,[12] because one of the agreement's recitals refers to "industry standards," and because Carolina Beverage offered testimony at trial that a manufacturer's invasion of a substantial portion of a distributor's territory violates industry standards; thus, Carolina Beverage continues, we must defer to the jury's construction of the agreement as containing a constructive termination provision because that construction is supported by substantial evidence.

We reject this argument for a few reasons. As a threshold matter, Carolina Beverage misapprehends the pertinent

_____

[12] Carolina Beverage also argues that the terms "national account" and "[l]ocal [o]utlet" are ambiguous, but any ambiguity in those terms is not germane to our analysis, so we need not address those arguments.

20

standards of review.  Courts may consider extrinsic evidence for two purposes—namely, (1) to answer the threshold question of whether a contract is "ambiguous" in the first place (that is, whether the contract's terms are reasonably susceptible to more than one interpretation); and (2) if the contract is ambiguous, to resolve that ambiguity.  Whether a contract is ambiguous as a threshold matter is a question of law for the court (*Joseph v. City of Atwater* (2022) 74 Cal.App.5th 974, 982), and that is as far as our analysis needs to go in this case because the agreement's termination provisions are unambiguous; thus, Carolina Beverage is getting ahead of itself when it argues that we must defer to the jury's construction of the agreement.  Why do we conclude that the agreement is unambiguous?  To begin with, the term "termination" is not undefined or otherwise ambiguous.  The agreement, as noted above, defines four ways in which the agreement may be terminated; the fact that the agreement does not contain a sentence starting with "'Termination' means" is thus of no moment.  Further, although the recitals set forth in a contract may be examined to interpret a contract's otherwise ambiguous operative terms (e.g., *Sabetian v. Exxon Mobil Corp.* (2020) 57 Cal.App.5th 1054, 1069-1070), the recital Carolina Beverage cites is irrelevant because (1) it cannot be used to override the agreement's otherwise unambiguous definition of termination; and (2) the recital itself at most applies industry standards *to Carolina Beverage's* obligations and not FIJI's, as the recital merely declares FIJI's "desire[] to retain [Carolina Beverage] to market and distribute its Products in the Sales Territory . . . in accordance with the *highest industry standards*." (Italics added.)  It is also well settled that industry standards cannot "'alter or vary the terms of [a] contract.'" (*Cal. Lettuce*

21

*Growers v. Union Sugar Co.* (1955) 45 Cal.2d 474, 482 (*Cal. Lettuce Growers*).)

Second, Carolina Beverage argues that, absent a constructive termination provision that renders it eligible for the termination payment, it is left without a remedy because the agreement elsewhere prohibits it from recovering "any . . . special, indirect, consequential," "lost profits or lost business" damages.

We reject this argument as well. For starters, any shortage of available remedies is a function of the agreement *that Carolina Beverage itself* negotiated; where, as here, two sophisticated and longstanding commercial businesses negotiate a contract, they are stuck with the terms of that contract. (*Rogoff v. Grabowski* (1988) 200 Cal.App.3d 624, 629 ["[i]n commercial contracts, . . . 'parties of roughly equal bargaining power are free to shape the contours of their agreement'"]; e.g., *Tunkl v. Regents of University of Cal.* (1963) 60 Cal.2d 92, 101 ["no public policy opposes private, voluntary transactions in which one party, for a consideration, agrees to shoulder a risk which the law would otherwise have placed upon the other party"].) To the extent Carolina Beverage feels that the agreement is unconscionable, it had the right to raise that challenge but opted not to do so. (*Food Safety Net Services v. Eco Safe Systems USA, Inc.* (2012) 209 Cal.App.4th 1118, 1127 [limitation of liability clause valid and enforceable unless unconscionable].) Moreover, the limitations-of-damages clause did not deprive Carolina Beverage of *all* remedies because it specifically negotiated a right to an invasion fee should FIJI invade its territory, as it did here. Carolina Beverage has only itself to blame for its tactical decision not to pursue the invasion fee at trial.

Carolina Beverage elsewhere argues that the invasion provision did not apply here for several reasons. It argues that the invasion provision did not apply because the retailers FIJI invaded were not qualifying "national accounts," but *FIJI*'s self-professed noncompliance with the provision did not deprive *Carolina Beverage* from seeking a remedy under that provision. It argues that the invasion provision did not apply here, pointing to testimony it elicited at trial that, under industry standards, invasion rights are meant to contemplate only "one-off" invasions rather than the deep incursion FIJI mounted in this case; however, this industry-standards testimony contradicts the plain text of the agreement, which imposes no such "one time only" or "maximum invasion percentage" limits. As noted above, industry standards cannot be used to rewrite a contract. (*Cal. Lettuce Growers*, *supra*, 45 Cal.2d at p. 482.) For the first time at oral argument, Carolina Beverage argued that the invasion provision did not apply because it is triggered when "FIJI may be presented with opportunities to sell and deliver Products directly" and the use of the passive voice implies that those opportunities must come to FIJI rather FIJI seeking out such opportunities. We decline to read a shift in verb tense as effecting a massive restriction on a right that the provision otherwise entrusts to FIJI's "sole discretion." Also for the first time at oral argument, Carolina Beverage argued that the invasion provision has a maximum percentage of permissible invasion because, elsewhere in the agreement, Carolina Beverage's failure to achieve at least 85 percent of its "mutually agreed upon sales goals" is a basis for FIJI to terminate the agreement. We do not see a connection between the two unrelated provisions, especially since any

invasion by FIJI would necessarily reduce the mutually agreed upon sales goals.

**C.    *Carolina Beverage cannot avail itself of constructive termination, even if such a theory were applied***

Even if we were to assume (contrary to our holdings) that constructive termination were a viable theory under either the common law or the agreement, the contract-based verdicts in Carolina Beverage's favor must still be vacated because the undisputed facts—even viewed in the light most favorable to Carolina Beverage—establish that Carolina Beverage did not treat the agreement as being terminated even *after* FIJI almost fully invaded its territory.  (*Licudine v. Cedars-Sinai Medical Center* (2016) 3 Cal.App.5th 881, 890 [JNOV must be granted where "the record, viewed in the light most favorable to the jury's verdict, [does not] contain evidence that is reasonable, credible and of solid value sufficient to support the . . . verdict"].)

Whenever the doctrine of constructive termination is available, a contract will be deemed to be constructively terminated only if the party claiming constructive termination "'puts an end to the contract.'"  (*Mac's Shell Service, Inc. v. Shell Oil Products Co. LLC* (2010) 559 U.S. 175, 183; *Wasatch Property Management v. Degrate* (2005) 35 Cal.4th 1111, 1121-1122 [to "'terminate'" means to "'put an end to'"]; Com. Code, § 2106, subd. (3) ["'Termination' occurs when either party pursuant to a power created by agreement or law puts an end to the contract"].)  This is why an employee is deemed to have been constructively discharged only if they have resigned (*Mullins*, *supra*, 15 Cal.4th at p. 738; *Turner*, *supra*, 7 Cal.4th at p. 1251; *Ortiz v. Dameron Hospital Assn.* (2019) 37 Cal.App.5th 568, 578), and a tenant is

24

deemed to have been constructively evicted only if they have vacated the premises (*Cunningham v. Universal Underwriters* (2002) 98 Cal.App.4th 1141, 1152 ["'In order that there be a constructive eviction it is essential that the tenant should vacate the property'"]). The reason for this is simple: A party cannot claim that a contract has been terminated if the party continues to act like the contract has *not* been terminated. (*Mac's Shell*, at pp. 183-184 ["a franchisee who continues operating a franchise . . . has not had the franchise [contract] 'terminate[d]' in either the ordinary or technical sense of the word"].) Indeed, the agreement itself required Carolina Beverage to "cease . . . all distribution" if it elected to terminate the agreement under any of its termination provisions.

It is undisputed that Carolina Beverage continued to distribute FIJI products through the end of 2018, and did so *pursuant to the terms of the agreement* and months after Carolina Beverage accused FIJI of constructively terminating the agreement. This is fatal to Carolina Beverage's constructive termination theory.

Carolina Beverage resists this conclusion with three arguments.

First, Carolina Beverage—echoing the trial court's reasoning in denying FIJI's JNOV motion—argues that FIJI's "conduct" in "siphon[ing] almost 90%" of Carolina Beverage's sales volume "breached the agreement and effectively [that is, constructively] terminated it." We reject this argument because whether FIJI *breached* the agreement (even severely) says nothing about whether Carolina Beverage opted to continue to treat the agreement as valid. By ignoring the separate requirement that Carolina Beverage put an end to the

25

agreement, this argument ignores the law and the very jury instruction the trial court gave at trial—both of which required proof that Carolina Beverage "end[ed]" "the relationship between the parties." (Accord, *Whitney Investment Co. v. Westview Development Co.* (1969) 273 Cal.App.2d 594, 602 ["A breach does not terminate a contract as a matter of course"].)

Second, Carolina Beverage suggests that it *could* not end the relationship because FIJI "demanded," "insisted" and "required" Carolina Beverage to continue operating under the agreement. For support, it cites the October 16, 2018 and November 6, 2018 letters sent by FIJI, both of which indicated FIJI's intent to "continue to meet its obligations under the [agreement]" and its "expect[ation that Carolina Beverage would] also fulfill its obligations under the [agreement]." The language in these letters was FIJI's response to Carolina Beverage's earlier representation in its September 24, 2018 letter that it might "cease performance upon [FIJI's] continuing breach" of the agreement; neither the language in FIJI's letters nor, as Carolina Beverage asserted for the first time at oral argument, the fact that it would be forced to choose between walking away from the agreement (and risking breach of the agreement) or continuing under the agreement (and losing the right to assert constructive termination) constitutes anything approximating coercion, particularly in light of Carolina Beverage's right *under the plain terms of the agreement* to terminate "immediately" if FIJI failed to cure a perceived breach.

Third, Carolina Beverage argues that the jury instruction on constructive termination did not require any written notice of termination. This is irrelevant, as the instruction required Carolina Beverage to "end" the "relationship"—notice or not.

26

**D.** *Carolina Beverage's further arguments*

Carolina Beverage makes two further arguments.

First, it effectively argues that the horse has left the proverbial barn because the issue of the agreement's meaning already went to the jury, because the jury was already instructed on the concept of constructive termination, because substantial evidence supports the jury's verdict, and because it is too late to address any defects in the special verdict form. All of these arguments ignore that the issue here is whether the trial court erred in letting the horse out in the first place and ignore that FIJI repeatedly and consistently urged the court to keep the barn door closed. At most, FIJI properly acceded to what we have determined were the trial court's erroneous rulings, but that does not amount to a waiver or forfeiture, or render it too late to fix the error. (*Gilkyson v. Disney Enterprises, Inc.* (2021) 66 Cal.App.5th 900, 918.)

Second, Carolina Beverage urges that its claim for breach of the implied covenant of good faith and fair dealing supports the jury's verdict because Carolina Beverage introduced evidence that FIJI's invasion of its territory violated industry standards and because the trial court instructed the jury that FIJI violated the implied covenant if FIJI "direct[ly] distribut[ed] to some retailers in [Carolina Beverage's] territories" in a way that "prevented [Carolina Beverage] from receiving the benefits under" the agreement. The jury instruction was wrong because it purported to prohibit (and thus create liability) for FIJI's invasion of Carolina Beverage's territory, which is conduct the agreement explicitly permits. The implied covenant exists to "protect the express covenants or promises of [a] contract" (*Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 690), but it cannot

27

be used "to prohibit a party from doing that which is expressly permitted by an agreement" or to otherwise "vary [the] express terms" of an agreement (*Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 374). We accordingly reject Carolina Beverage's attempt to use the implied covenant to effect an end run around the plain terms of the agreement. Carolina Beverage relatedly urges that the implied covenant can be used to substitute the termination payment as the measure of damages for FIJI's breach, but using an implied covenant in this fashion would also rewrite the agreement, which explicitly provides that the *only* instance when the termination payment comes into play is when FIJI terminates the agreement with 30 days' written notice.[13] Carolina Beverage lastly lambasts FIJI's conduct as a "stealth attack" undertaken with an "insidious purpose," but FIJI's allegedly "malevolent" "motive[s]" are "irrelevant to a breach of contract claim." (*JRS Products, Inc. v. Matsushita Electric Corp. of America* (2004) 115 Cal.App.4th 168, 182.)

### E. *Remedy*

In light of our conclusion that the jury's verdicts on the breach of contract and breach of implied covenant claims are

---

[13] At oral argument, Carolina Beverage expanded on this argument by asserting that the termination payment was an appropriate measure of damages because it was the amount that FIJI was enriched by virtue of not having to make the termination payment. But this assertion only works if FIJI was, in actuality, obligated to make the termination payment under circumstances outside those specifically set forth in the agreement. As we have concluded, that is not the case. Thus, the only way to accept Carolina Beverage's expanded argument is to rewrite the agreement.

28

invalid legally and factually, we reverse the trial court's denial of a JNOV on those claims and direct the trial court to enter judgment for FIJI on those claims.  (Code Civ. Proc., § 629, subd. (c); *Bank of America v. Superior Court* (1990) 220 Cal.App.3d 613, 624-626 [reversal of order denying JNOV "concludes the litigation just as it would have been concluded if the trial court had correctly entered the" JNOV]; *McCoy v. Hearst Corp.* (1991) 227 Cal.App.3d 1657, 1661 (*McCoy*) [reversal of order denying JNOV effectively "advis[es] the trial court that a nonsuit, directed verdict or JNOV should have been entered"]; *Jordan v. Guerra* (1943) 23 Cal.2d 469, 472 [appellate court orders judgment be entered for defendant]; *Morton v. California Sports Car Club* (1958) 163 Cal.App.2d 685, 691 [same].)

Carolina Beverage requests that, rather than place the parties in the situation they would be in had the trial court properly granted the JNOV (that is, entering judgment for FIJI), we instead remand the matter for a new trial on those claims so that it may pursue alternative measures of damages.  We decline this request.  Carolina Beverage freely admits that it abandoned all measures of damages except the termination payment during the trial.  However, contrary to Carolina Beverage's inaccurate representation that it did so "to simplify the case it presented to the jury," its choice was a strategic and tactical one:  By asking the trial court to instruct on only the termination payment and not to present the jury with a special verdict form that gave the jury the option of awarding the lesser damages of the invasion fee or lost profits due to the invasion, Carolina Beverage intentionally presented the jury with a stark choice—award us the $2 million termination payment or award us nothing.  Carolina Beverage is not entitled to revisit its strategy and

obtain a second bite at the apple now that we have rejected as unviable the sole legal theory it decided to prosecute. (*McCoy*, *supra*, 227 Cal.App.3d at p. 1661 [because plaintiff would not be entitled to new trial if trial court correctly granted a JNOV, plaintiff not entitled to "another trial when the appellate court makes the same determination"].)

## II. Concealment

Carolina Beverage argues that it is entitled to a new trial on its concealment claim because the trial court erred in two of its evidentiary rulings. An erroneous ruling entitles a party to a new trial only if ""there is a reasonable probability that a result more favorable to the appealing party would have been reached in the absence of the error."" (*D.Z. v. Los Angeles Unified School Dist.* (2019) 35 Cal.App.5th 210, 231; Evid. Code, §§ 353, 354.)

### A. *Pertinent facts*

As noted above, Carolina Beverage's concealment claim is based on its allegations that (1) FIJI kept secret its intent to fully invade Carolina Beverage's territory; and (2) had Carolina Beverage known of FIJI's intent, it would have started negotiating to become the third-party distributor for FIJI's main competitor, Evian.

At trial, Carolina Beverage adduced evidence that Evian's distributor was looking to license local third-party distributors in Carolina Beverage's territory in the fall of 2018, but that Carolina Beverage did not put itself up for consideration (because distributors are prohibited from working with both competitors simultaneously) until Carolina Beverage received FIJI's nonrenewal letter in late November 2018, by which time another third-party distributor (Pepsi Bottling Ventures) was licensed for North Carolina. Carolina Beverage nevertheless ultimately

30

became an Evian distributor in parts of South Carolina and Georgia.

At trial, FIJI elicited testimony from an executive of the Evian distributor that was searching for local third-party distributors to license that (1) Evian had not started looking in earnest for a third-party distributor in Carolina Beverage's territory until November 2018 and had not made a final decision by November 28, 2018; and (2) he "would have listened" to whatever pitch Carolina Beverage might have made earlier in the fall of 2018, but that he "[did]n't know if that would have changed anything." FIJI also introduced portions of Carolina Beverage's September 24, 2018 letter, in which Carolina Beverage asserted that FIJI had breached the agreement and that FIJI owed the invasion payment *and* the termination payment, but expressed that it was "prepared to continue to perform its obligations" under the agreement.

Carolina Beverage also sought to introduce three additional pieces of testimony from the Evian distributor's executive— namely, his testimony that (1) Evian "would have listened" to whatever pitch Carolina Beverage made, had it approached Evian earlier; (2) the distributor would have needed to collect certain data from Carolina Beverage to compare against Pepsi, although he "couldn't [have told] you what" outcome that would have produced; and (3) the distributor made its decision to go with Pepsi in North Carolina in November or December of 2018. The trial court excluded this evidence as speculative.

B.   *Analysis*

1.   *September 24 letter*

The trial court did not err in admitting the September 24 letter. Carolina Beverage asserts that the letter constituted a

31

"settlement offer" inadmissible under Evidence Code section 1154. That provision excludes "[e]vidence that a person has . . . offered to accept a sum of money . . . in satisfaction of a claim, as well as any conduct or statements made in negotiation thereof . . . to prove the invalidity of the claim" against it. (Evid. Code, § 1154.) This provision did not bar admission of the September 24 letter because the letter was nothing more than "'[a] statement by a claimant concerning the extent of [its] injuries . . . , or concerning the amount of damages [it] claims to have suffered,'" which is *not* an offer to accept a compromise. (*Zhou v. Unisource Worldwide, Inc.* (2007) 157 Cal.App.4th 1471, 1477.) This provision also did not bar admission of the September 24 letter because Evidence Code section 1154 is claim specific, in that it bars admission of an offer to accept a compromise of a claim only to prove the invalidity *of that claim*. (*Zhou*, at p. 1479.) Because the September 24 letter was at most an offer to accept settlement of Carolina Beverage's outstanding *contract-based* claims, it was not inadmissible to prove the invalidity of its factually and legally distinct *concealment* claim.

    2. *Additional testimony from the Evian distributor's executive*

  The trial court also did not commit prejudicial error in excluding the three additional pieces of testimony from the Evian distributor's executive. Even if we assume that the trial court erred in declaring the executive's three further statements speculative, Carolina Beverage failed to show that their admission was reasonably likely to result in a different outcome. That is because, even if the jury had heard that Evian "would have listened" to Carolina Beverage's offer and considered its additional data, the executive also testified that he "[did]n't

32

know" whether doing so "would have changed anything." Taken as a whole, a jury hearing all of this testimony would have come to the same conclusion it actually came to without the excluded statements—namely, that it was unclear whether an earlier pitch by Carolina Beverage would have mattered to the distributor's decision about which third-party to license.

## III.  Attorney Fees Award

Because we have vacated the two contract-related claims on which Carolina Beverage prevailed at trial and have affirmed the jury's verdict rejecting Carolina Beverage's concealment claim, Carolina Beverage is no longer the prevailing party and the attorney fees award must be vacated. The trial court is directed to conduct further proceedings on remand regarding FIJI's entitlement under the agreement to attorney fees and costs.

## DISPOSITION

The judgment is reversed, the order denying FIJI's motion for JNOV is reversed, and the order awarding Carolina Beverage's attorney fees is vacated.  The trial court is directed to enter judgment for FIJI and to conduct further proceedings regarding attorney fees and costs.  FIJI is entitled to its costs on appeal.

**CERTIFIED FOR PARTIAL PUBLICATION**.


_____, J.
HOFFSTADT


We concur:


_____, Acting P. J.
ASHMANN-GERST


_____, J.
CHAVEZ